## CAVAZOS v. TREVINO.

1. Where an early Spanish petition for a grant of land described the land by general boundaries, which were capable of an interpretation in two senses, one broader than the other, the terms of boundary open to question as to meaning were held to be rightly interpreted by the jury from a survey carefully made on the ground by lines and monuments, and specifying the quantity within the lines (the grant referring to the survey and specifying the quantity granted), and by practical interpretation, from occupancy and otherwise, by the parties interested in the matter.

2. In settling, in such a case, what has been granted, the quantity of land specified, as well as the boundaries named, and the survey as made— all are to be considered, and by their united light the proper conclusion is to be reached.

3. The practical interpretation which parties interested have by their conduct given to a written instrument, in cases of an ancient grant of a large body of land asked for and granted by general description, is always admitted as among the very best tests of the intention of the instrument.

4. In construing such a grant, the circumstances attendant, at the time it was made, are competent evidence for the purpose of placing the court in the same situation, and giving it the same advantages for construing the papers which were possessed by the actors themselves.

5. A document duly certified, "in the absence of a notary public, according to law," in the presence of witnesses, by the alcalde of the jurisdiction, to be a true copy, made and compared by witnesses named, of the original

record of proceedings had in the adjudication of lands granted by the government to persons named—(in which proceedings it became necessary to ascertain a particular boundary line)—was held to have been properly received in evidence in this case, under certain statutes of Texas, on a question relating to that boundary ; the alcalde's official character and signature, and that of the attending witnesses, being proved, and that they were dead.

ERROR to the District Court for the Eastern District of Texas; the case being thus :

In 1776, Salvador de la Garza "denounced," that is to say, made application to the authorities of New Spain for a tract of land north of the Rio Grande, in the now State of Texas, called sometimes the " Agostadero," and sometimes the " *Potrero*" of the *Espiritu Santo.**  The lands asked for were described as bounded " on the east with the lagunes (*lagunas*) of the sea; on the west by a thick wood;† on the south by the margins of the Rio Grande, and on the north by a ravine which comes out of the sea."  In June, 1779, the proper officer proceeded to take testimony as to the possession had of the land by Salvador, and of its boundaries and character.  There were five witnesses.  They stated that the " potrero" asked for had as its boundaries and outlines (linderos), the Arroyo Colorado,‡ the *lagunes*, the Rio Grande, and a thicket-wood; three witnesses saying, " the lagunes;" one saying, " the lagunes of the sea;" and one, " the lagunes immediately communicating with the sea."  The possession of the applicant being satisfactory to the judge, that officer proceeded, in company with Salvador, to make an actual survey.  The surveyor's record of this operation first describes the nature of the ground as fit only for grazing, on account of the many marshes made by the tides of the sea, and freshets of the Rio Grande and Colorado; that

---

* Both the words, "Agostadero " and " Potrero," signify places for pasturing cattle; the latter word, perhaps, a place inclosed so as to keep them in it.

† Salvador, at an early day, had cut a passage through this wood to get to the potrero.

‡ The word " *arroyo*," or *arollo*, means a stream, sometimes a mountain stream.

Diagram.

it had in many places a sort of grass which animals would not eat, " which usually grows on salt marshes near the coast of the sea;" on which account (with others set forth), "it is only useful as regards horses and all other stock, by *the security which and protection which is afforded, on account of the potrero having but one entrance and exit through the dense thicket which runs across it from the Colorado to the Rio Grande.*"

The record then states that the survey begins at a watering-place for cattle, on the Rio Grande, in the southwest corner of the tract, and that the first line ranged from it, course east, going in a straight line from it, "along the banks of Rio Grande, down the stream," 584 cords, at the river, at a slough (*derrame*), from it, by which in its freshets it supplies a tank with water, " which was left lay above; bore up stream at a distance of six cords, which slough was left as a natural landmark," and a monument fixed; there remaining—the record said—on this line, to the south, recesses and elbows formed by the Rio Grande, which " the surveyor would notice hereafter."*     This was one day's work.

The second day's record of the surveyor's action was thus :

" In the said place of the slough of the river in which ended the first line, he ran the second line straight to the north, and at 206 cords we came to the head of one of the lagunes of the sea, besides others that were seen to the east, and having gone round the head of this first one and various others which succeeded, communicating with each other, following always the north course, the surveying cord came to a little pocket or meadow which the said lagunes make, these laying on the west and east until they reach '*Lagunas Madres*,' which are formed by the Arroyo Colorado, and into which its waters empty, there being far within this line (something more than a league), a place improved . . .; and there being no more land on account of our having reached the said Lagunas Madres, and having nothing before us but water, the second line amounted to 993 cords in the whole."

---

* The derrame, tank, or slough, fixed as a point in the survey, was about eighteen miles above the mouth of the Rio Grande

The third day recorded that in the place on the Colorado where it expands into the broad lagunes (Lagunes Madres), the surveyor began the third line, running up the stream, course west, &c., 584 cords, the same number with the line on the Rio Grande; a part of the line, owing to impassable ravines, thicket, &c., described, being conjectural.

A fourth line, in part conjectural, to the watering-place, closed the survey.

The surveyor, noting that he had estimated the elbows made between the first line and the Rio Grande, declared that "within the four said lines were contained 59 square leagues (*sitios de ganadas mayor*) and 11½ caballerias of land."

After the survey was completed, the attorney of the treasury advised the granting of the "59 sitios de ganadas mayor and eleven and a half caballerias of the Potrero Espiritu Santo, under the natural outlines which the surveys state," and a grant itself was made to Salvador in due time afterwards (September 26th, 1781), of the same quantity of land, described in the same words, "within the limits of the colony of New Santander, and not exceeding its natural boundaries."

Salvador took possession, and lived on the tract till 1802. In that year he died, leaving three children, to whom his estate went, as it seemed, equally, and to the rights of one of whom, Cavazos, the present plaintiff, succeeded.

Salvador appeared to have had different ranches on this tract, and to have exercised more or less possession over various parts of it.

In 1829 one Trevino, who, as it was said, truly or not so, had been but an agent of some of the children or grandchildren of Salvador, joining himself with some other parties, occupants of the soil, and, as was attempted to be proved, co-owners with the plaintiff of the undivided whole, applied to the state authorities of Tamaulipas and got grants for the parts which lie east of the line marked on the map as the surveyor's line; tracts designated as San Martin, Sta. Isabel, and Buena Vista. Cavazos, who, as already said, had suc-

ceeded to the rights of one of Salvador's three children, now brought trespass to try title to the third of a part east of the line and to recover possession, the question in controversy being the eastern boundary of the tract; and this, perhaps, being complicated by the fact that there was on *most* of the eastern side of the tract a long body of water, called the *Laguna Madre*, made by a long narrow island, running outside the shore (a place likened by counsel somewhat to Long Island Sound), and also numerous smaller lagunas, running into the coast. Whether the land ran *to* the *shore*, which brought it to the Laguna Madre, and in one sense to the *sea-shore*, and in one, to the *laguna* of the *sea*, or only *to* the little lagunas, which might in one sense be called the lagunes of the *sea*, and in another but lagunes of the sound or Laguna Madre, this was a question. One part of the strip—a part between the mouth of the Rio Grande and the Boca Chica—was *on* the sea; no lagune running beside *it*.

The plaintiff adduced witnesses to show occupancy by Salvador with more or less specific assertion of title over every part of the tract; that by the term "potrero" was meant a place so inclosed by natural boundaries as that cattle put there to graze could not easily get out of it; that the tract derived its chief advantage to Salvador from its thus being a potrero; that it could only be so by coming to the water's edge along its whole eastern line; that it was not customary in early Spanish surveys to meander along either rivers or curved shores, but *to* make elbows and estimate; that if the surveyor had gone to the *mouth* of the Rio Grande and then north, he would have run into the sea; and that if he had meant to run the eastern line in a convenient way, and to survey by running base lines by cardinal points, the land inclosed by the thicket, the Rio Grande, *the lagunes*, and the Colorado, he would have run the lines much as he did; and finally, to show that according to general reputation the property of Salvador was a *potrero*, a place for grazing inclosed by four natural boundaries. As matter of argument he relied on the principle of law that parties are never presumed to leave a narrow strip between land and

water merely because certain stakes or trees stand at a slight distance from the river.

The evidence of the defendants was to prove long adverse possession on their part up to the surveyor's line; that the term "potrero" did not mean so absolutely as was asserted an *inclosure* for feeding cattle; that whatever Salvador had asked for or desired, this was controlled by the survey actually made and the monuments fixed; that it was impossible to regard as unmeaning the fact, that the surveyor had made no reference to such monuments as the mouth of the Rio Grande and the shore of the Gulf of Mexico.

In the course of the trial the plaintiff excepted to the admission and to the exclusion of various testimony, and on its conclusion to instructions given and to those refused by the court. All these, and what is further necessary to be known of the case, are stated by the learned justice who gave the opinion of the court.

*Messrs. Hale and Robinson, for the plaintiff in error; Messrs. Sherwood and R. Hughes, contra.*

Mr. Justice SWAYNE delivered the opinion of the court.

The plaintiff in error brought an action of trespass in the court below to try the title to the real estate in controversy between the parties, and to recover possession. There were numerous defendants. The suit was dismissed, or judgment by default rendered as to all of them but the two who are before us as defendants in error.

The plaintiff sought to recover an undivided third of the premises, which are claimed to be a part of the tract known as the Agostodero, "and the potrero of the Espiritu Santo grant," situated between the Arroyo Colorado on the north, the Rio Grande on the south, and extending from a thick wood on the west to the lagunes of the sea on the east. The real controversy between the parties was as to the locality of the eastern boundary line of this tract.

The land in controversy lies between that boundary as claimed by the defendants in error, and the sea and lagunes communicating with the sea.

The plaintiff deraigned title by a grant from the authorities of New Spain, of the 26th of September, 1781, to Jose Salvador De la Garza, containing fifty-nine leagues and eleven and a half cabellerias of land.

The defendants claimed under a grant made by the authorities of the State of Tamaulipas, by a title of possession issued to Ignaceo Trevino, on the 26th of February, 1829, and confirmed by a final title issued by the governor on the 29th of May, in the same year. The defendants insisted that the western boundary of the land embraced in this grant was the same as the eastern boundary of the tract granted to De la Garza, as they alleged that boundary to be, while, according to the plaintiff's claim, all the land granted to Trevino was included in the prior grant to De la Garza.

The court instructed the jury substantially:

(1) That the question in controversy was the true eastern boundary of the Espiritu Santo tract, and that it was a question of fact to be determined by the jury upon the evidence before them.

(2) That it was their duty to consider all the testimony bearing upon the subject.

(3) That if those claiming under the Espiritu Santo grant had never been in possession east of the line claimed by the defendants—had acquiesced in that line, and set up no claim inconsistent with it, until within a comparatively recent period—those facts were proper to be considered by the jury.

At the request of the defendants, the court further charged—

(4) That the grant itself shows that a corner was established at the derrame or slough, 548 cords from the beginning corner, whence a line was run north by the tanque mentioned in the grant to a pocket or small potrero on the Laguna Madre, where another corner was established, and that this was to be considered the east boundary, unless another one was established by the evidence.

(5) That if Trevino and those claiming under him had held adverse possession up to the line run for the western

boundary of the San Martin grant to the time of the com-
mencement of the action—being a period of ten years or
more—in good faith under a just title, then the jury should
find for the defendants.

(6) That if Trevino and those claiming under him had
held adverse possession of the land in controversy for twenty
years and more, before the commencement of the suit, then
the jury might presume a valid grant giving title to the land
claimed.

(7) That if the jury find there never was any contest be-
fore the commencement of this suit between the owners of
the Espiritu Santo grant and Trevino—except as to bound-
ary—being a dispute whether the true line was that run in
1781, or that of 1828 run for the western boundary of the
San Martin grant—and that Trevino and those claiming un-
der him had possession up to 1828, adversely to those claim-
ing the adjoining land in the Espiritu Santo grant, and up
to the commencement of the suit, the jury may presume
that the land within the line of 1828 belongs to the San
Martin grant.

To all these instructions the plaintiff's counsel excepted.

The plaintiff's counsel then asked the court to instruct
the jury—

(1) That if they find that the Espiritu Santo grant in-
cluded the land in controversy, then no adverse possession,
subsequent to that grant, can authorize the presumption of
another and an adverse grant.

The court refused to give this instruction, and an excep-
tion was taken.

The plaintiff's counsel thereupon asked the court further
to instruct the jury—

(2) That a party in possession under an undivided grant
of a tract of land, and claiming the whole under a paramount
title, is in possession of the whole, and is not affected by an
adverse possession of a part, claimed and held under an
inferior title or without title, and that the person holding
under such inferior title can have no protection from the
statutes of limitation or by prescription.

This instruction was given, but at the request of the counsel for the defendants, it was modified as follows:

(3) That if Trevino and those claiming under him had exclusive possession for twenty years or more, east of the boundary line in dispute, then a grant may be presumed to him, though the Espiritu Santo grant is the elder one, and there has been possession under it west of that line.

To this modified instruction the plaintiff excepted.

The jury found for the defendants, and found further, "that the eastern boundary line of the Espiritu Santo grant of 1781, is a line commencing at the mouth of the derrame of the tanque on the Rio Grande, and thence running north to the pocket described in said grant."

The plaintiff thereupon moved for judgment, *non obstante veredicto*, for so much of the premises in controversy as lies east of the line established by the verdict, and west of the line of 1828, being a gore, containing, according to the testimony of one of the witnesses, about nine leagues of land. The court overruled the motion and the plaintiff excepted.

Exceptions were also taken by the plaintiff to the admission and to the exclusion of testimony, which will be stated specifically when we come to consider them.

It is insisted by the plaintiff in error, that the court erred in construing the documentary evidence relating to the eastern boundary of the Espiritu Santo grant, and that it adopted the theory of the defendants. We do not so understand the charge as to the latter point. It is somewhat confused both in thought and language, but its general effect is clear. It left the question to the jury, to be determined according to the evidence, without any controlling instructions upon the subject. They might consistently with the charge have found the line claimed by either party to be the true one. If any error was committed by the court against the plaintiff, it was in not recognizing, as matter of law, the line insisted upon by her, instead of submitting the question to the jury.

Did the court err in withholding this recognition in the charge?

The *denunciation*, and the identification of the line by the witnesses, describe it as bounded on the coast by the lagunes of the sea. The most important testimony is the survey, the facts attending it, and the subsequent links in the chain of title. The survey was made with great care and formality. It commenced at a watering-place on the Rio Grande, in the southwest corner of the tract. The first line was run 584 cords down the river to a slough, near a tanque, which was filled from the river during high water. This slough was designated " a natural landmark," and the denunciant was ordered to place there an artificial monument. From this point, the next day, the second line was run due north. At the end of 206 cords the surveyor came to the head of one of the " lagunes of the sea"—others were seen to the east. Having gone round the first and others that succeeded, following always the north course, the line reached a little pocket or meadow made by the lagunes. They were found to extend to the lagunes madres which were formed by the Arroyo Colorado. Having reached the lagunes madres, and there being nothing before them but water, the surveyor there terminated the line of that day, which was found to be 993 cords in the whole, in length. " The bend or little pocket before mentioned," it is said, " remained as a natural landmark." An artificial one was also placed there. Owing to natural obstacles, the other two boundary lines were designated without actually running them. The last one terminated at the beginning corner. According to the rule of the Spanish law, where a survey is intended to bound on a stream, a straight line was run from the beginning point to its termination at the slough, and the quantity of land in the bends of the river was ascertained by computation without actual measurement. The slough was about five leagues from the mouth of the river. If it were intended that the eastern boundary should be the shore of the sea, and of the lagunes connected with it, why was the first line terminated at the slough, and why was a line run due north from there? Why was not the first line extended to the mouth of the river, or to a point nearer to it, and a line run thence to the

north. The lagunes of the sea, and not the shore of the sea, is called for as the boundary on that side. The proof shows that those lagunes could form such a boundary only in part. There is no controversy that the Rio Grande is the south boundary. The proof shows also, that from the mouth of that river north it is several miles to the Boca Chica, which is the first lagune found there. For the intervening distance the shore of the sea, and not lagunes of the sea, must be the boundary according to the claim of the plaintiff in error. There is nothing which shows that the land lying between the east line as run, and the shore of the sea, and of the lagunes communicating with the sea, was included in the computation, or that the grantee had not his full quantity without it.

The attorney of the treasury advised the granting of the "59 sitios de ganadas mayor, and eleven and a half caballerias of the Potrero Espiritu Santo, under the natural outlines which the surveys state."

The grant itself was of the same quantity of land, specified in the same terms, "within the limits of the colony of New Santander, and not exceeding its natural boundaries."

In construing this grant, the attendant and surrounding circumstances, at the time it was made, are competent evidence for the purpose of placing the court in the same situation, and giving it the same advantages for construing the paper, which were possessed by the actors themselves. The object and effect of such evidence are not to contradict or vary the terms of the instrument, but to enable the court to arrive at the proper conclusion as to its meaning and the understanding and intention of the parties. Viewing the subject in this light, we cannot say that the legal effect of the grant is to carry the eastern boundary of the grant to the line contended for by the plaintiff in error. Whether of itself it fixes that boundary, as is insisted by the defendants in error, is a question which in this case it is not necessary to determine. It is enough to say that the instructions on the subject given to the jury were as favorable to the plaintiff as she was entitled to ask. If there was an error, it was

not against her.   There is nothing of which she has a right
to complain.   The quantity of land specified, as well as the
boundaries named, and the survey as made, is to be con-
sidered.   It is by their united light that the proper con-
clusion is to be reached.   Together, we think, they leave
little room for doubt as to the intention and effect of the
grant.

The finding of the jury that the line surveyed was the east
line of the Espiritu Santo grant, renders what was said by
the court as to adverse possession and the presumption of a
grant immaterial in the case.   Right or wrong, those in-
structions could have done the plaintiff no injury, and,
therefore, constitute no ground for disturbing the verdict
and judgment.

The instruction given as to the acquiescence of the parties
in respect to the line run for a long period, was correct.
The practical interpretation which the parties, by their con-
duct, have given to a written instrument in cases like this,
is always admitted, and is entitled to weight.   There is no
better test of the intention of the instrument.   None are
less likely to be mistaken.   There is no danger of too large
an admission.   Safer testimony can hardly be presented in
relation to any transaction occurring in human affairs.

The motion for a judgment *non obstante veredicto* assumed
as correct a construction of the grant, the opposite of the
views we have expressed.   We think it was properly over-
ruled.

Upon the trial the defendants offered in evidence a copy
of the record of the original proceedings relating to the
Santa Isabel, San Martin, and Buena Vista grants, in sur-
veying which it became necessary to ascertain and fix the
east line of the Espiritu Santo grant.   The plaintiffs objected
to the admission of this testimony, upon the ground, that at
the time of the recordation of the documents there was no
law which authorized them to be recorded.   This objection
was overruled, and the plaintiff excepted.   The defendants
then proved the genuineness of the signature of Domingo
De la Garza, and that he was alcalde of Matamoras in 1829.

They also proved the signatures of the assisting witnesses, and that they were dead.

The plaintiff then objected to the admission of the testimony, upon the further grounds that the document did not appear to be the first copy or testimony issued to the interested party; that it was not proved to be a true or compared copy, of the original protocol, and because it did not appear that the original protocol was duly signed by the proper officer. These objections were also overruled, and the plaintiff excepted.

The questions thus presented are to be decided by the light of the statutory provisions of the State of Texas which bear upon the subject. We have carefully examined those to which our attention has been called. They are found in Arts. 745, 2754, 2758, 2787, 2800, in Hartley's Digest. The result is, that we are .satisfied that the testimony was properly admitted. It could serve no useful purpose, and would greatly extend this opinion, to go into a full examination of the subject. We deem it sufficient to announce the conclusion at which we have arrived.

The defendants next offered in evidence a copy, proved to be correct, from a paper on file in the archives of the city of Mexico, purporting to be a conveyance from Maria Francesco Cavazos to Miguel Paredes. The plaintiff objected to its admission, because it did not appear that Francesco Cavazos had ever executed the instrument, or authorized the instrument to be executed for her. We do not deem it necessary to examine the subject in the light of the Spanish law, to which our attention has been called. As the case was before the jury when the evidence was closed, we think it was entirely immaterial. Its admission or rejection could not change the result. If improperly admitted—a point which we do not find it necessary to consider—it did the plaintiff no injury, and, therefore, constitutes no reason for reversing the judgment. The power of attorney made by Prieto to Trevino, the will made by Trevino under that authority, and the conveyance by Prieto to De la Garza, offered in evidence by the plaintiff,. and excluded by the

court, were clearly irrelevant and incompetent. The ruling of the court was correct.

The same remarks apply to the proceedings before the Supreme Court of Tamaulipas, also offered in evidence by the plaintiff. They were properly excluded by the court. The title-papers relating to the grant to Trevino were again objected to by the plaintiff upon the grounds: (1) That the land which appeared to have been granted by the authorities of Tamaulipas was within three littoral leagues of the coast of the Gulf of Mexico, and that the approbation or consent of the general executive of Mexico was not shown. (2) That the grant appeared on its face to be for more than 125,000 square varas. (3) That it appeared in the proceedings, that a controversy had arisen during the survey as to the ownership of the land affected thereby, and that it had not been settled in the usual and proper manner, but by the exercise of authority assumed by the executive officers, contrary to the colonization laws of Mexico and Tamaulipas. The court sustained the first objection, and the documents were excluded as showing a valid grant of land, but were allowed to be read in evidence to show boundary and possession. To this qualified admission of the testimony no exception appears in the record. We need not, therefore, consider the learned and elaborate argument submitted by the counsel for the defendants in error to show that the documents were admissible for all purposes, and that the objections of the plaintiff **in** error to their admission are untenable.

These are all the exceptions to which our attention has been called.

We find no error in the record, and the

JUDGMENT IS AFFIRMED.