JOHNSTON et al. v. COLE et al.

No. 5462.

Court of Civil Appeals of Texas. Texarkana.

Jan. 4, 1940.

Rehearing Denied Jan. 18, 1940.

Weeks, Hankerson & Potter, of Tyler, for appellants.

Bramlette, Levy & Dotson, of Longview, Read, Lowrance & Bates, of Dallas, and Frank C. Bolton, Jr., of Longview, for appellees.

WILLIAMS, Justice.

This suit involves the interpretation of three conveyances, each in identical form, except that different tracts of land in the same area in Gregg County are affected. These were executed March 10, 1932, by M. T. Cole and wife as grantors, herein referred to as defendants. In each instrument defendants reserved an overriding royalty on oil and gas produced, in terms reading:

"It is further provided, understood and stipulated that the grantors reserve unto themselves, and shall retain and have ⅞₂ of all the oil, gas and minerals produced from the said land as a perpetual overriding royalty, except as hereinafter provided, * * * to be reduced only upon the happening of the contingency * * * hereinafter explained.

"In connection with the above, it is understood that if and when any oil well drilled on said land shall become incapable of producing more than one hundred (100) barrels of oil per day, then the grantors herein shall be entitled to an overriding royalty in and out of that particular well of ⅞₄ instead of ⅞₂ as above provided; and this provision shall apply only to such wells as may become incapable of producing more than one hundred (100) barrels of oil per day; and this shall apply only from and after the time that same have been reduced to 100 barrel wells."

T. A. Johnston, trustee, and John Owens, trustee, plaintiffs below, the joint owners and operators of the leasehold estates under Cole, developed the properties by bringing in their first well in the summer of 1932, and additional wells to a total of thirty-one by August 28, 1936, the date this suit was filed. During this period, or up to a short time prior to institution of this suit, plaintiffs, through the pipe line purchasers of the oil under division orders executed by plaintiffs and defendants, have paid to defendants for the oil produced on a basis of ⅞₂ of the production. The Sun Oil Company and American Pipe Line Company were sued for a ⅞₄ of the oil purchased and retained by these companies after notice of this suit, for which the Coles had not been paid. These purchasers tendered

and paid into the court the amount held by them, and in the judgment were discharged from further liability. This phase of the litigation will not be noticed further. In the relief sought against the Coles plaintiffs seek a reduction of the overriding royalty from a ⅞₂ to a ⅞₄ interest, it being alleged that the oil wells upon the land had become incapable of each producing 100 barrels or more of oil per day under above-quoted provision.

The court filed findings of fact and conclusions of law. The court's findings of fact pertinent to the issue involved are, in substance, as follows: (1) That on February 25, 1932, which was prior to the execution of the conveyance here involved and before any well had been drilled by plaintiffs, proration orders were promulgated and made effective under the authority of law by the Railroad Commission, fixing the allowable oil production in the East Texas oil field at not more than 75 barrels of oil daily per well. Subsequently other proration orders were duly promulgated from time to time which reduced the allowable to a daily maximum varying between 20 and 28.21 barrels production per well. (2) That legitimate purchasers of oil could not lawfully purchase oil without a tender which could not be secured unless it be shown that the oil had been produced in accordance with the proration allowable. (3) That defendants never required or requested that oil be produced from any of the wells in excess of the allowable; that neither plaintiffs nor defendants questioned the validity of the proration orders; that plaintiffs operated the wells prudently and in compliance with the rules and regulations of the Railroad Commission, and that at no time did plaintiffs produce as much as 100 barrels per day from any well. (4) That each and all of the oil wells situated on the properties are at the time of trial, and were before and have been continuously since August 28, 1936, by natural producing ability physically capable of producing and bringing to the surface per day and daily more than 100 barrels of oil. (5) The court further found from the uncontradicted evidence of R. D. Parker, a petroleum engineer and formerly chief superintendent of the Oil & Gas Division of the Railroad Commission of Texas, that to produce 100 barrels or more of oil per day from each well would not be in accord with the prevailing practices obtain-

ing in the oil industry in the area and would be considered imprudent because to produce such amount daily would cause a channeling of the oil sand, coning of salt water into the sand, and an entrapment of quantities of oil otherwise recoverable, and decrease the bottom hole pressure, all of which would be unfavorable to the greatest ultimate recovery of oil; and that regulation by proration makes for the greater ultimate recovery of oil in the field as well as for better prices, for oil had sold as low as 10¢ per barrel before production had been regulated and had risen to $1.35 after proration. No exception was taken and none here urged to the foregoing findings of fact. In addition to the foregoing findings, the uncontradicted evidence discloses that in November 1937, the date of this trial, the hourly potential production rating of the wells situated on these properties ran from 720 to 990 barrels.

The court concluded, as a matter of law, that the provision first herein set out is determinative of the case, and should be construed by the court and enforced according to its terms; and that "the above provision is unambiguous and clear of purpose of the parties and means, and should be so interpreted, as applying only to the natural ability of the oil wells of producing and bringing to the surface more than 100 barrels of oil per day. The words 'such wells as may become incapable of producing more than 100 barrels of oil per day' mean, and have reference to the natural deficiency in flow of the oil wells inherent in the wells themselves to a point below and not exceeding 100 barrels of oil per day, and, as used and intended by the parties, do not mean nor have reference to, an artificial restriction upon daily production solely, such as imposed by State proration and regulations." Accordingly defendants were awarded judgment for the money impounded, and plaintiffs denied a recovery of the relief sought.

Plaintiffs contend, first, that such stipulation means incapable of producing such amount when reasonably and prudently operated without waste and only when that amount of oil can be marketed at the market price; and, secondly, because of the proration laws the wells have become incapable of producing the stated amount. If this had been the intention of the parties, or if they had intended to qualify this stipulation to actual production, more apt language expressive of such intent could and no doubt would have been used. To give the stipulation the meaning insisted upon would necessitate the court's altering and adding to the stipulation appropriate terms and phrases expressive of this intent. The word "incapable" as ordinarily and usually employed means "lacking or wanting in natural ability, capacity or qualification; lacking adequate power; without general or ordinary ability." The word "producing" so used signifies "bringing into existence." Neither is a technical term used in any particular trade or profession. Accordingly, the phrase "incapable of producing" in ordinary and popular use would mean and have reference, as found by the trial court, to the natural deficiency in flow of any oil wells inherent in the well itself to a point below and not exceeding 100 barrels of oil per day. This conclusion is further supported by the fact that the stipulation in express terms is made to apply only to "that particular" well or to "such" wells as may become incapable of producing the stated amount.

The court's finding that to produce 100 barrels of oil per day would be unfavorable to the greatest ultimate recovery of the oil and therefore would be considered an imprudent operation of this property is applicable not only to these wells but all wells in the East Texas oil field. To obtain the greatest ultimate recovery of oil from any field in Texas is one of the underlying purposes of the Texas proration laws. Prior to the date these mineral conveyances were executed there was then in effect a valid law providing for the promulgation of proration orders by the Railroad Commission. This Commission had promulgated an order restricting the production of each well in this area not to exceed 75 barrels of oil daily, and subsequently to the execution of these conveyances had further restricted the daily production. As stated in Exum v. Laub, 5 Cir., 87 F.2d 73, 74, "If reduction by proration had been in the minds of the parties, more apt language could, and no doubt would, have been used. * * * when a contract is ambiguous the construction adopted by the parties will be given great, sometimes controlling, weight by the courts." Exum v. Laub, supra, and authorities there cited; Cavazos v. Trevino, 6 Wall. 773, 73 U.S. 773, 775, 18 L.Ed. 813. Neither of these wells ever

produced 100 barrels of oil per day on account of the proration orders. Notwithstanding, plaintiffs paid to defendants through the pipe lines a $\frac{7}{32}$ of the oil produced from 1932 until a short time prior to filing this suit.

The judgment is affirmed.