## BEENE v. MIDSTATES OIL CORPORATION.

No. 13696.

United States Court of Appeals
Eighth Circuit.

Sept. 13, 1948.

Rehearing Denied Oct. 11, 1948.

H. S. Yocum, of El Dorado, Ark., and W. H. Bronson, of Shreveport, La. (Mahony & Yocum, of El Dorado, Ark., and Tucker, Bronson & Martin, of Shreveport, La., on the brief), for appellant.

Charles W. Barnes, of Tulsa, Okl., and Jeff Davis, of El Dorado, Ark. (Davis & Allen, of El Dorado, Ark., on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

WOODROUGH, Circuit Judge.

This civil action was brought by S. J. Beene, the owner of oil bearing lands in Columbia County, Arkansas, against Midstates Oil Corporation, to obtain cancellation for fraud of a lease executed by plaintiff to defendant and to recover amounts alleged to be due the plaintiff under those terms of the lease which provide for the payment of royalty on production of oil and gas called overriding royalty addi-

tional to the one-eighth royalty required by the lease. The lease provided that the overriding royalty should be calculated on each well separately, and be fixed at one-eighth, but should be reduced to one-sixteenth when the well was "not capable of producing 50 barrels of oil per day when operated by a competent operator utilizing efficient and practicable methods and equipment for producing oil and gas." Plaintiff claimed to be entitled to the full one-eighth overriding royalty up to the time of suit and that he had been paid only one-sixteenth over a certain period. He charged that defendant had fraudulently caused the other one-sixteenth to be withheld from him and had itself fraudulently obtained and appropriated it. The defendant pleaded that the lease, including its overriding royalty provision, had been amended and modified by a contract entered into by the plaintiff, the defendant and a large number of other persons subsequent to the execution of the lease, identified as the "Haynesville Unitization and Pressure Maintenance Agreement." That by said Agreement the productive area which included plaintiff's leased lands, was to be exploited as a unit and the plaintiff agreed with the defendant that if and when the part of the gross production of oil from the unitized area of the zone allocated to any one of the wells within plaintiff's lease should be less than 50 barrels of oil per day during any accounting period, the maximum one-eighth overriding royalty to which the plaintiff is entitled with respect to oil and gas produced from any one of said wells should be reduced by one-half for that accounting period. It alleged that plaintiff had been paid and tendered payment of all overriding royalties due him in accordance with the lease as so amended and that it was not indebted to plaintiff. It denied fraud.

The plaintiff did not deny executing the Unitization and Pressure Maintenance Agreement subsequently to the lease or that he was fully bound by it or that it effected substantial changes in the obligations of the lease, including the obligations evidenced by the overriding royalty provisions thereof, but he stood on his allegation that he remained entitled to the full one-eighth overriding royalty notwithstanding the Agreement. There was federal jurisdiction because of diversity of citizenship and requisite amount involved.

The case was tried to the court without a jury, and upon the facts found the court concluded:

"2. The Unitization and Pressure Maintenance Agreement modified and amended the terms of the lease with reference to the payment of the overriding royalty by changing the monthly basis thereof from the amount of oil and gas a well was capable of producing, when operated by a competent operator utilizing efficient and practicable methods and equipment, as set forth in the lease, to the amount allocated at the end of the month to the unit upon which the well was situated, derived from the operation of the entire unitized area in accordance with the participation formula set forth in the agreement.

"3. The amount allocated to each production unit determines the fraction or rate of the payment of the overriding royalty. In those months where the allocated amount averages less than 50 barrels of oil per day, the overriding royalty due the plaintiff is reduced from 1/8 of 8/8ths to 1/16th of 8/8ths.

"4. The amount of production allocated to each unit in which the plaintiff is interested fairly represents the amount due him from the operation of the unitized area, and the payments paid or tendered to him for his overriding royalty were calculated in accordance with the allocation and rate of the payment of the overriding royalty fixed by such allocation."

Pursuant to the findings of fact and conclusions of law arrived at by the court it entered judgment of dismissal of plaintiff's case at his costs and he takes this appeal. He states that if the foregoing conclusions of law numbered 2 and 3 of the trial court were correct, "then the Lower Court was correct in dismissing the suit," and the record so shows. The primary question in the case therefore is whether or not the plaintiff remained entitled to one-eighth overriding royalty in respect to a well covered by his lease when unitized operation of the zone under the Agreement resulted in allocation pursuant

to its formula, of less than 50 barrels of oil per day to such well.

### The Facts.

The appellant has not assigned as error any of the findings of fact made by the court and we find them supported by the stipulation and evidence, and that they constitute a fair presentation thereof. We set them out as follows:

"2. On October 2, 1942, the plaintiff, for good and valuable consideration, executed, and delivered to the defendant the oil and gas lease involved herein.

Inter alia the lease provides:

" 'In addition to the royalty hereinabove provided for, Lessee covenants and agrees to deliver to the credit of Lessor the equal of 1/8 of 8/8th part of all oil produced and saved from the leased premises and 1/8 of 8/8ths of gas produced from said leased premises, calculated in the same manner as provided hereinabove for the regular one-eighth (1/8) royalty on oil and on gas. With respect to any well situated on the leased premises (or situated on an adjoining tract with which a part of the land covered by this lease may be unitized or merged under the authority hereinabove given) it is understood that the overriding royalty shall reduce to 1/16th of 8/8ths for such period or periods of time as such well is not capable of producing 50 barrels of oil per day when operated by a competent operator utilizing efficient and practicable methods and equipment for producing oil and gas. The overriding royalty herein provided for shall be calculated on each well separately.'

"3. The Pettit Zone of the Haynesville Field was developed on a well spacing pattern of one well to a rectangular 80-acre tract, the tracts being elongated North and South. That spacing pattern was fixed by the Conservation Commissioner of Louisiana for the Louisiana portion of the field and by the Arkansas Oil & Gas Commission for the Arkansas portion of the field. In each case where an 80-acre drilling unit was owned in severalty by two or more land owners, the designated 80-acre tract and the oil and gas lease covering it were unitized to form the specified drilling unit. Each lease owner and royalty owner under such agreement was entitled to receive from the unitized 80-acre tract as royalty or leasehold interest a portion of the production from the unitized 80-acre tract in accordance with his property right in the parcel of land contributed to the formation of the 80-acre unit.

"Pursuant to the lease the defendant formed eight drilling units composed in whole or in part of the land covered by the lease and upon each a well was drilled. Two were dry holes and six were producers, as follows:

"(1) Midstates-Beene-Beckett No. 1, completed April 30, 1943; (2) Midstates-Beene-Beckett No. 2, completed July 4, 1943; (3) Midstates-Waller Heirs No. 1, completed January 3, 1944; (4) Midstates-Beene-Waller, No. 1, completed February 15, 1944; (5) Midstates-S. J. Beene No. 1, completed March 3, 1944; (6) Midstates-Skelly-Pipes-Beene No. 1, completed October 5, 1944.

"4. The Haynesville Unitization and Pressure Maintenance Agreement was executed by the plaintiff and more than 1200 other royalty owners and the defendant and other operators as of the 10th of January, 1944, and was finally made effective on May 1, 1944. The plaintiff was a member of the Temporary Royalty Owners' Committee during the negotiations preceding the drafting of the agreement and was named as one of the fifteen members of the Royalty Owners' Committee in the agreement. He owns extensive interests in the Haynesville Field, not only under the land in controversy but also under other land in both Arkansas and Louisiana.

"Wells No.'s 1, 2 and 3, as set forth in paragraph 3, were included in the unitized area when the agreement became effective on May 1, 1944. Well No. 4 was placed in the unitization area on June 4, 1944. Well No. 5 was placed in the area on July 1, 1944, and Well No. 6 was first included in the unitized area on February 1, 1945.

"5. Some of the purposes of the Unitization Agreement are set forth as follows:

" 'Whereas, it is the purpose of the parties hereto to conserve natural resources, prevent waste and to avoid the drilling of

unnecessary wells, promote economical and efficient management and secure other benefits obtainable through development and operation of the Unit Area subject to this agreement under the terms, conditions, and limitations hereinafter set forth, and to provide a fair apportionment of the resultant benefits among the parties entitled thereto.'

"The Haynesville Field was first developed as a producer of oil and gas from a shallow sand in 1921. Only the Pettit Zone in the field is unitized by the agreement. It was not the purpose to unitize all of the producing horizons, but only to consolidate for unit operation the Pettit Zone which lies at the depth of approximately 4900 feet to 5500 feet. If production is obtained in the future from land included in the lease from any other zone, the provisions of the original lease will remain in full force and effect as originally written in so far as production from any horizon other than the Pettit Zone.

"The Pettit Zone is a closed structure with no water drive from any of its boundaries or from the bottom. There is no free gas in the gas cap. The porosity of the rock containing the oil and permeability are low so that the only expulsive agency for moving the oil into the wells and thence to the surface is the gas that is contained in the oil itself. Many of the wells situated on the 12,000 acres of land affected by the Unitization Agreement were producing an excessive ratio of gas to oil, and all royalty owners and lease owners were interested in unitizing the zone and in its skillful operation in order to recover the maximum amount of oil and gas from the zone. The Unitization Agreement contemplated that inefficient wells would be shut off and production taken only from wells that would produce with the greatest efficiency or with the least dissipation of reservoir energy. Also, a Recycling and Pressure Maintenance Plant was to be erected by the operators to inject into the zone gas produced from that horizon along with the oil back into the horizon and to extract casinghead gas, butane and other liquid hydrocarbons from the gas prior to the injection. Thus each well producing from the unitized area lost its identity as a separate producing unit. At the time of the trial, seventeen wells had been converted into wells for injecting water into the horizon. One of such wells is Well No. 1 involved herein. Six wells in the area were being used for injecting gas into the zone.

"6. Five of the wells, No.'s 1, 2, 3, 4 and 5, were completed prior to the effective date of the Unitization Agreement and each produced an average of more than 50 barrels of oil per day during each month prior to the date upon which it was included in the Unitization Plan. If those wells were operated independently at full capacity and not under the Unitization Agreement providing for monthly allocations, the production of each would be in excess of 50 barrels per day. The plaintiff was paid during that time the lessor's 1/8th regular royalty and the 1/8th overriding royalty.

"Well No. 6 was completed on October 4, 1944, but was not included in the Unitization Plan until February, 1945. The Division Order governing the payment to the royalty owners and the operators in reference to this well provided that the overriding royalty should be reduced by 1/2 'when production is less than 50 barrels per day from well flowing naturally' or 'when production is less than 50 barrels per day from well not flowing naturally.'

"Wells No.'s 1, 2 and 3 were included in the area and operated under the agreement from the effective date thereof, May 1, 1944. From that time until December 1, 1944, the quantity of oil produced from the zone and allocated to each of these wells averaged more than 50 barrels of oil per day, but beginning on December 1, 1944, the quantity of oil allocated to each of these [well] has been less than an average of 50 barrels per day, except there was allocated to Well No. 2 more than an average of 50 barrels of oil per day during the month of February, 1945, and there was allocated to Well No. 3 during each of the months of January, February and March, 1945, and January and February, 1946, more than an average of 50 barrels of oil per day.

"Well No. 4 was unitized on June 1, 1944, and there was allocated to it an aver-

age of more than 50 barrels of oil per day during each month until December 1, 1944. Then the allocation to that well was less than 50 barrels of oil per day, except for the month of February, 1945, when the allocation exceeded an average of 50 barrels per day.

"Well No. 5 was included in the unitized area on July 1, 1944, and an allocation of less than 50 barrels of oil per day was assigned to that well and it has never had an allocation of more than 50 barrels of oil per day.

"Well No. 6 was included in the unitized area on February 1, 1945, and its allocated production until April 1, 1945, exceeded 50 barrels of oil per day. Since that time the allocation has been less than 50 barrels of oil per day, except during the month of January, 1946.

"Wells No.'s 1 and 2 were completed prior to the execution of the Unitization Agreement affecting the Pettit Zone. Shortly after the completion of each, the plaintiff executed a separate division Order to Gulf Refining Company with respect to each of said two wells setting forth his interest in the gross production of oil produced from each and purchased by Gulf Refining Company. Each Division Order provided that Beene should receive a 1/8th overriding royalty until notice from Midstates Oil Corporation to discontinue the payment of the interest to him, and that thereafter Beene should be paid a 1/16th overriding royalty on the production from the described 80-acre drilling unit. A somewhat similar Division Order was executed by plaintiff with respect to Wells 3, 4, 5 and 6 addressed to Sohio Petroleum Company. Each of these Division Orders provided for the payment of overriding royalty to plaintiff and that the overriding royalty should be reduced by half on notice from Midstates Oil Corporation, or, in the case of Well No. 6 only, from Skelly Oil Company.

"Each Division Order to Gulf Refining Company provided that plaintiff could terminate the effect thereof with respect to his interest on notice at any time, and each Division Order to Sohio Petroleum Company provided that plaintiff could cancel the effect thereof with respect to his interest at any time on 30 days written notice.

"7. The Unitization Agreement provides a definite formula through the application of which a said percentage of the gross production of oil and gas from the area during each calendar month should be allocated as the quantity of oil and gas to which the owners of various interests in that unit would be entitled. Such formula was adopted in order that each operator and each royalty owner might obtain his fair share of the oil and gas produced from the unitized area by virtue of his interest in each 80-acre drilling unit.

"8. The unitized area of the Pettit Zone was operated by an Operators' Committee consisting of eighteen persons appointed by the persons owning interests in production therefrom as lessees, with the consultation and advice of a Royalty Owners' Committee consisting of fifteen members. The actual operations have been conducted by a separate organization employed for that purpose by the Operators' Committee. The plaintiff has been a member of the Royalty Owners' Committee since the effective date of the unitization, and since that date a representative of Midstates Oil Corporation has been a member of the Operators' Committee. Since such unitized operation became effective on May 1, 1944, the field has been operated competently, utilizing the most efficient and practicable methods and equipment possible for producing oil and gas, and the field has consistently produced the greatest amount of oil of which it was capable under efficient and practicable methods of operation as contemplated by the Unitization Agreement.

"Under this operation the Committee has made monthly allocations to each of the units involved in this case. Those monthly allocations were made by the Committee in good faith and represent a fair apportionment to the plaintiff of the production from the unitized area.

"When the monthly allocations were less than an average of 50 barrels of oil per day the defendant notified each Pipe Line Company making payment for oil allocated to each of the wells for that month that the overriding royalty payable to plaintiff, with respect to oil allocated to each unit

for that month, should be reduced by 1/2. In each instance such notice was made upon the advice of counsel and upon the belief by the defendant, acting in good faith, that under the terms of the Unitization Agreement, the overriding royalty of the plaintiff with respect to the production allocated was so reduced.

"9. The plaintiff in his brief admits that the actual production from a production unit shall be disregarded under the specific provisions of the Unitization Agreement and that there shall be substituted for the actual production the allocated production for the particular unit. Such is the provision of Article II of the agreement.

"Beginning with the last paragraph on Page II of the agreement it is provided:

" 'When the allocated monthly sales of oil, or the value thereof, for each Production Unit shall have been determined, as hereinabove provided, the pipe line company or other purchaser of the oil produced and sold from each Production Unit in the Unit Area from which it shall have run the oil during the preceding month shall withhold and pay the proportionate part of all severance, production or other taxes levied by the State or any lawful taxing authority on account of the ownership, severance, production or sale of the oil so allocated to the particular Production Unit, and shall then pay over the respective amounts due to each Operator and to the Royalty Owners to whom such Operator may be obligated on account of the oil production allocated to the particular Production Unit, in accordance with the Division Orders, Transfer Orders or other contracts or agreements with reference to the oil production from the said particular Production Unit, it being agreed that the payments to be made to any Operator or Royalty Owner are to be based upon its proportionate part of the production from the entire Unit Area in accordance with the Participation Factor of each particular Production Unit rather than based upon the actual production from that particular Production Unit. * * *'

"Beginning with the last paragraph on page 15, it is provided:

" 'It is understood and agreed that payments to all Operators and Royalty Owners are to be made on the basis of an assumed production in the amount or value of the Unitized Substances allocated under the agreement to each Production Unit in lieu of the actual production from each Production Unit.'

"Article V on page 17 provides:

" 'It is agreed that as to the Pettit Zone underlying all lands within the Unit Area, the drilling and development requirements of all leases and contracts have been and will be fully met and discharged by the performance of the provisions hereof; that payments made upon the basis herein stipulated shall constitute full performance of all obligations to pay rentals, royalties and all other sums whatsoever which may become payable to Royalty Owners; that production of Unitized Substances from any part of the Unit Area, except for determining the respective amounts of payments due to Operators and Royalty Owners, which shall be on the basis of allocated production in accordance with Article II hereof, shall be considered production from each and every tract of land embraced therein, as fully and to the same extent as though such production was had from a well or wells located on each tract of land and each and every portion thereof located and situated within the Unit Area. * * *'

"Article XII of the agreement reads:

" 'Each Royalty Owner hereby grants to his respective Operator or Operators the right to purchase for the account of such Operator or Operators or to sell the interest of the Royalty Owners in the Unitized Substances at the price and on the same terms and conditions as such Operator sells his interest in said Unitized Substances. All Royalty interests of every nature whatsoever shall be accounted for and paid on the basis of prices prevailing in the Haynesville Field for Substances of like quality and character on the date of sale or purchase, in accordance with the royalty provisions of the respective lease contracts, except as herein modified or amended.'

"Article XX of the agreement reads as follows:

" 'The parties hereto or consenting hereto agree that the existing permits, leases, pooling agreements, drilling and operating

contracts, overriding royalty agreements, or other instruments affecting the lands covered by this agreement owned or held by the parties subscribing or consenting hereto, shall continue in full force and effect to the extent that they or any one or more thereof, are not in conflict with the provisions of or are not modified by this agreement, but in case of conflict the provisions of this agreement during its effectiveness shall govern and control, and such other agreements shall be and the same are hereby modified and amended accordingly.'

"10. Checks have been issued to the plaintiff in payment of all amounts due him for the regular royalty for each and every month. Checks have also been issued to the plaintiff for the 1/8th overriding royalty for all the months where the allocation to each unit was more than 50 barrels of oil per day, and checks have been issued to plaintiff for all other months in payment of the overriding royalty reduced to 1/16th for those months when the allocation was below an average of 50 barrels of oil per day, except when otherwise requested by plaintiff.

"11. The Operators' Committee began operating the Recycling and Pressure Maintenance Plant in March, 1945. The plaintiff was paid royalty with respect to gasoline, dry gas and other products processed through the plant for the year 1945. Those payments were made in the month following the end of the regular calendar quarter. The plaintiff received a check for $1,156.73 for the first quarter of 1946 and a check in the sum of $1,610.90 for the second quarter of 1946. The amounts of the other checks received by him from the operation of the plant on the Arkansas land owned by him are not shown by the evidence.

"12. At all times involved the plaintiff and defendant were dealing at arm's length.

"At no time in this cause has the defendant conspired with any purchaser of oil to receive for its interest in oil or gas produced from any one of the wells or drilling units here involved, a greater price for its interest in the oil or gas produced therefrom than was paid to the plaintiff for his interest in such oil or gas.

"At no time has the defendant received a greater price for its interest in oil or gas produced from any one of the wells here involved than the plaintiff received for his interest therein. At no time has the defendant received any bonus with respect to its interest in oil or gas produced from any one of said wells.

"13. On May 13, 1945, the plaintiff with knowledge that the overriding royalty had been reduced, together with other members of the Royalty Owners' Committee, addressed a letter to Haynesville Operators' Committee, demanding that the operators make additional expenditures to enlarge the recycling plant. Plaintiff knew at that time that defendant would be required to pay a part of the expense of that enlargement by virtue of its ownership of the six wells here involved. The operators complied with that request and the defendant contributed Five Thousand One Hundred Eighty-three Dollars ($5,183.00) to the cost of enlarging the recycling plant chargeable to the defendant because of its ownership of the lease which the plaintiff seeks to cancel."[1]

## Opinion.

The problem in this case is to determine the basis upon which the parties to the lease and to the subsequently executed Unitization and Pressure Maintenance Agreement have contracted that they shall respectively be compensated for the use of and the operations upon the leased lands. It involves determining the true intent of the parties from the lease and the Agreement in their relation to each other in the

---

[1] Formal finding No. 1 is omitted. Conclusions of law numbers 5 and 6, additional to those noted read:

"5. There was no relation of trust or other confidential relation between the plaintiff and the defendant relative to any of the matters involved in this cause. The defendant did not defraud the plaintiff in any matter involved herein and plaintiff is not entitled to a cancellation of the lease.

"6. The plaintiff is not entitled to recover and the complaint should be dismissed for want of equity, and an order dismissing the complaint and adjudging the costs against the plaintiff is being entered today.

"This 2nd day of December, 1947."

light of the facts as found. The Agreement recites that one of its purposes is "to provide a fair apportionment of the resultant benefits among the parties entitled thereto," and there can be no doubt that on the face of the document it does direct the apportionment and payment of the whole benefit of the unitized operation of the area to the parties entitled upon a basis prescribed by its terms. It provides for the sale of the product of the unitized operation of the pooled area and establishes the basis upon which the vendee shall make payment of the purchase money to the royalty owners, the operators and other interests, and that such payments shall constitute full performance of all obligations to pay all sums whatever which may become due to royalty owners. The plan of the Agreement for consummating payment to the royalty owner is complete and it is clear that all such payments shall be made on the basis of an assumed production calculated and arrived at according to prescribed formula. It precludes resort to other bases of calculation to arrive at payments due any interested party by its specific provisions and its whole scheme for production and calculation and distribution of benefits is inconsistent with and in contrast to the use of actual or natural flow production of any well as a basis of calculation of a royalty or overriding royalty interest. The only basis contemplated for determining such interests is the assumed basis produced by the technical method of reckoning set forth in minute detail in the Agreement. An allocation made on that basis is the only measure of individual interest contemplated by the Agreement.

Such assumed basis is in conflict with the basis of calculation of payments provided in the royalty and overriding royalty provisions of the lease. Both the one-eighth royalty and the one-eighth override were according to the lease to be calculated on the basis of the saved product of each well and admittedly the Agreement supersedes and supplies a new basis for both those calculations, the new basis being the "allocation" provided for by the agreement. The substitution of the "allocation" for the former basis of actual production does not result because of express words of substitution in the Agreement. It follows from the conflict between the old basis defined in the lease and the new basis defined in the Agreement and the declaration of the Agreement that the new shall control over the old.

That this is true as to the first sentence of the overriding royalty provision of the lease is not questioned. In the second sentence of the same provision the lease contemplates that the question whether one-eighth or one-sixteenth overriding royalty shall be paid shall depend upon capability of the individual well to produce 50 barrels of oil per day under a kind of operation which is done away with by the unitization and pressure maintenance agreement. The basis of the lease for measuring the fluctuating amount of the overriding royalty is therefore as directly in conflict with the basis prescribed in the agreement for measuring all payments to royalty owners, to-wit, the basis of allocation, as was the basis in the lease for calculating the 1/8 royalty. Both of the old bases are modified and amended by the agreement. The extent of the overriding royalty, like the 1/8 royalty itself, must accordingly be determined upon the basis of the allocation provided for in the Agreement.

The defendant conceded on the trial that the provisions of the Agreement were in conflict with the lease provisions concerning the reduction of the overriding royalty from 1/8 to 1/16 and that determination whether 1/8 or 1/16 was due should not be made to depend on the capacity of the individual well as provided in the lease. As found by the court, some of the wells produce nothing under the new operation and some through which water is injected may be rendered incapable of producing, so that the plaintiff would get nothing from them on the basis specified in the lease. But it was and is now appellant's position that it should be determined that the whole unitized area was capable of producing some such a quantity of oil per day greater than it has been producing, that an allocation should be made to the plaintiff's units of more than 50 barrels of oil per day and on such allocation an override of 1/8 instead of 1/16 should be computed. He contends that the overriding royalty should be based on "the natural ability of the oil

wells of producing." Exum v. Laub, 5 Cir., 87 F.2d 73; Midas Oil v. Whitaker, 1938, Tex.Civ.App., 123 S.W.2d 495; Tarver v. Bracken, 1939, Tex.Civ.App., 134 S.W.2d 808; Johnston v. Cole, 1940, Tex.Civ.App., 135 S.W.2d 524.

Each of the cases appears to have been decided upon the particular facts shown and specific language of the agreements controlling decision and thought to be unambiguous. But none involved interpretation of such a Unitization and Pressure Maintenance Agreement as the plaintiff has signed and is bound by in this case. Here the words in the title of the Agreement presaged a pooled operation aimed at getting the most out of the area by efficient methods, excluding the concept of competitive production from one well against another,[2] and the provisions of the instrument as a whole compel the conclusion that the part of the production of the pool as a whole allocated according to formula to any production unit was agreed to be the sole basis to be used in arriving at the interest which any royalty owner was to be paid under its terms whatever the provisions of his original lease may have been. Where that lease called for fluctuating royalty on the basis of production or capacity to produce, the basis under the Agreement became resolved into the "allocation" produced under its formula.

The contentions to the contrary have been considered. However elaborated, they require reading into the Agreement some method for arriving at a basis of calculation of payments by reference to a competitive operation or some assumed natural flow, which it is the purpose of the Agreement to eliminate. They require the calculation of payments to be made to plaintiff on a basis different from and in conflict with that contemplated by and provided in the Agreement. By entering into the Agreement the plaintiff has obtained the benefits of the unitized operation and pressure maintenance and must be held bound by its terms. They have been complied with in good faith and they limit the payments due him to the amounts which result from the substitution of the allocation made to him for any other basis of computation. Accordingly we decide that the conclusions of law announced by the court upon the facts found were not erroneous.

Affirmed.

---

[2] In fact, although the utmost pains and skill have been devoted to operation to get out the most that could be got efficiently, at times more has been taken than should have been taken.