The JOHN G. AND MARIE STELLA KENEDY MEMORIAL FOUNDA- TION and Corpus Christi Diocese of the Roman Catholic Church, Petition- ers,

v.

David DEWHURST, Commissioner of the General Land Office, and The State of Texas, Respondents.

No. 99–0667.

Supreme Court of Texas.

Argued April 11, 2001.

Decided Aug. 29, 2002.

Rehearing Denied Dec. 31, 2002.

Paul W. Nye, Gary E. Ramirez, Roberta S. Dohse, Chavez Gonzales & Hoblit, Corpus Christi; Shannon H. Ratliff, Akin Gump Strauss Hauer & Feld, Austin; Marc O. Knisley, Thomas J. Forestier, McGinnis Lochridge & Kilgore, Houston; Richard L. Leshin, The Kleburg Law Firm, San Antonio; and Mike A. Hatchell, Hatchell, P.C., Tyler, for Petitioner.

John J. McKetta, III, Ben F. Vaughan, III, Kathryn E. Allen, Boyce C. Cabaniss, John B. McFarland, Graves Dougherty Hearon & Moody, Austin; and John Cornyn, Attorney General of the State of Texas, Austin, for Respondent.

Justice HECHT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice OWEN, Justice O'NEILL, Justice JEFFERSON, and Justice RODRIGUEZ joined.

After issuing an opinion in this case on December 21, 2000,[1] we granted petitioners' motion for rehearing[2] and entertained

---

1. 44 Tex. Sup.Ct. J. 268 (Dec. 21, 2000).

2. 44 Tex. Sup.Ct. J. 455 (March 1, 2001).

oral argument a second time.[3] We now withdraw our earlier opinion and judgment and issue the following as the opinion of the Court.

The State and a private landowner dispute the location of the shoreline boundary of two early nineteenth century land grants, one by Spain and the other by Mexico. In *Luttes v. State*,[4] we determined that the law of those two sovereigns governing such grants was that a shoreline is to be found where the mean daily higher high water level—that is, the average of daily highest water levels—reaches the mainland. Now we are asked to decide whether and how the civil law determined in *Luttes* applies to the present shoreline boundary dispute. The lower courts agreed with the State that the shoreline should be located without reference to mean daily high water levels because of the problems in measuring those levels in the Laguna Madre near the land at issue and instead placed roughly as far inland as water ever reaches in ordinary storms, based on the historical record.[5] We disagree and hold instead that the civil law as determined in *Luttes* applies here and requires that the shoreline boundary in this case, like all others governed by civil law, be set at measured mean daily higher high water levels. We therefore reverse the judgment of the court of appeals and remand the case to the trial court for rendition of judgment in accordance with this opinion.

## I

The John G. and Marie Stella Kenedy Memorial Foundation and the Corpus Christi Diocese of the Roman Catholic Church (collectively, "the Foundation")
jointly own property which, as shown by the appended maps, comprises two tracts lying just west of Padre Island roughly halfway between Corpus Christi and Port Isabel. One tract, called La Barreta or the "Big Barreta", was originally conveyed by King Charles IV of Spain in 1804 and 1809 to Lieutenant Jose Francisco Balli (who, as an historical aside, was a nephew of Padre Nicolas Balli, the grantee of Padre Island). The other tract, called Las Motas de la Barreta or the "Little Barreta", is adjacent the Big Barreta to the north and was originally conveyed by the Mexican State of Tamaulipas in 1834 to Leonardo Salinas. The 1804 grant was lost, but a later patent from the State of Texas confirming the conveyance described the Big Barreta's eastern boundary in the same words used to describe the Little Barreta's eastern boundary in the 1834 grant—"the waters of the Laguna Madre".[6] The State, of course, owns the submerged land and the shore between the Foundation's property and Padre Island. The Foundation and the State dispute the location of the shoreline boundary along nine miles of the eastern edge of the Foundation's property. Locating that boundary is made difficult by the nature of the seawater inundation of this part of the Laguna Madre. The parties' respective positions conflict starkly. The Foundation claims that the boundary is the west bank of the Intracoastal Waterway, where water has always been present since it was dredged in 1949. The State claims that the boundary is about six miles to the west at a bluff line marked by a slight rise in elevation and changes in terrain and vegetation, where water is present at most once or twice a year for a few days. What

---

3. *Id.* at 456.

4. 159 Tex. 500, 324 S.W.2d 167 (1958).

5. 994 S.W.2d 285.

6. *See State v. Spohn*, 83 S.W. 1135 (Tex.Civ. App.-Austin 1904, writ ref'd).

has brought the present controversy to a head is not any local change in conditions in the Laguna Madre, which has remained the same in this vicinity for two hundred years, but rather the increased importance of oil and gas production in the area. The disputed area totals about 35,000 acres.

The Laguna Madre, translated "Mother Lagoon", whose waters were prescribed by Spain and Mexico to mark the disputed boundary, is a narrow estuary on the west side of Padre Island extending some 130 miles from Corpus Christi to Port Isabel. The Laguna Madre is open to the Gulf of Mexico at both ends but sheltered from the Gulf along its length by Padre Island. In many areas, including adjacent the Foundation's property, it is slightly above sea level. The presence and depth of water in most of the Laguna Madre is governed not by astronomic tidal forces from which it is insulated, like those exerted by the moon and sun, but by meteorological forces to which it remains open, like the wind and barometric air pressure. In much of the Laguna Madre, including the area in dispute, variations in water levels due to daily tidal forces are minuscule, masked almost entirely by variations caused by atmospheric forces. The water does not advance and subside daily, as one thinks of a shore facing the open sea. The wind can actually blow water uphill so that it is sometimes deeper at higher elevations than at lower ones. At places, the Laguna Madre is constantly inundated with seawater several feet deep, deep enough for waves and boats. One such place, "the Hole", is near the northeast corner of the Foundation's property; another, "the Hook", is at the southeast corner of the property. At other places, however, including the area east of the Foundation's property, inundation is—and it is important to understand these precise characteristics—*regular*, that is, periodic in the sense of continually recurrent, as opposed to sporadic; *shallow*, usually no deeper than a few inches; and *infrequent*, occurring only several days, weeks, or months a year, depending on the area. The rest of the time the area is a dry, boggy, barren mud-flat, devoid of vegetation except for a leathery algae. The perimeter of the mud-flats, which is as far as water ever gets in ordinary storms, is a "bluff" marked more or less by a small but distinct rise of a foot or more in elevation and a distinct change in vegetation and ground conditions.

The State offered, and the lower courts relied on, historical evidence regarding the treatment of the Big Barreta and Little Barreta grants. An 1809 survey of the Big Barreta by Antonio Margil Cano showed an eastern boundary approximately at the same bluff line that the State now argues should mark the eastern boundary of the Foundation's property. Grantee Balli immediately petitioned for conveyance of an elevated area east of the bluff line that was seldom inundated and was suitable for grazing. This area, now called the Mesquite Rincon, was rather like an island in the Laguna Madre and is nearly surrounded by the area now in dispute. Because it could often be reached only by a narrow isthmus from the Big Barreta through the mud flats, it was useless to anyone else and was therefore granted to Balli. (Again, for visualization, we refer the reader to the appended maps.) The 1809 survey and Balli's petition, which was granted, may indicate—we will discuss this in due course—either that Balli did not think or was at least unsure that the 1804 grant conveyed anything east of the bluff line, or that he cared most about measuring what land was suitable for grazing. As for the Little Barreta, an 1834 survey by Domingo de la Fuente omitted a triangle of land on the southeast corner of the rectangular tract which extended into the Laguna Madre and was unsuitable for

grazing, and added to the northeast corner a triangle of land of approximately the same size that was not inundated, so that the grantee Salinas would have the full amount of grazing land that he had requested. Another survey of the Big Barreta in 1882 and the Little Barreta in 1879 by J.J. Cocke, and a survey of the Big Barreta around 1907 by F.M. Maddox—all done when grazing was all that mattered— never included any area east of the bluff line in the landowners' property, and the owners at those times do not appear to have objected. The exact boundary never appears to have been at issue.

The State also offered evidence that the Foundation's predecessors in interest affirmatively treated the bluff line as the boundary of their property until the mid-twentieth century, and that the Foundation did not render the mud flats for ad valorem taxation until 1987. The trial court excluded this evidence on the theory that later owners' actions were irrelevant in determining the original intent of the sovereigns expressed in the grants. The Foundation contends that the evidence shows only that its predecessors in interest cared mostly about land usable for grazing while maintaining their claim to the waters of the Laguna Madre.

In 1949, Sun Oil Co., to whom the State had leased the minerals in part of the now disputed area, sued the Foundations' predecessors in interest and Humble Oil & Refining Co., to whom they had leased the minerals in the same area, to determine whose lease was valid. Humble's position was not that the mud flats had originally been conveyed to the landowners, but that they had since accreted to the mainland. The federal district court rejected Humble's contention, and the Fifth Circuit affirmed in *Humble Oil & Refining Co. v. Sun Oil Co.*[7] Regarding the location of the shoreline, the Fifth Circuit acknowledged that it was required to apply Texas courts' understanding of civil law, which it believed—mistakenly, as it turned out several years later when we decided the matter—to be that the shoreline is the highest level reached by the water in winter. In 1958, we held in *Luttes v. State* that a civil law shoreline is the mean daily higher high water level, not the highest water level.[8] We will have much more to say about both these cases, but for now it is important merely to note their place in the sequence of events leading up to the present litigation.

A mean daily higher high tide—which the parties agree in this case is synonymous with mean daily higher high *water*— is calculated by averaging the highest elevations reached by water each day over a tidal epoch of 18.6 years. Of course, as we recognized in *Luttes*, water level data is not available at all locations on the coast, and where it is available it may cover only part of the lengthy epochal cycle. But averages may nevertheless be obtained by extrapolation from data that is available, adjusting for known, cyclical variations. At times on the Texas coast there are two daily high tides and two daily low tides. Mean higher high tide is an average of only the higher of the daily levels. Mean high tide is an average of both high levels. This distinction is immaterial in areas of the Laguna Madre where tidal influences and daily fluctuations in water levels are ordinarily quite small. Thus, for purposes of this case, daily higher high water is indistinguishable from daily high water.

Prior to 1995, surveying regulations promulgated by the General Land Office

---

7. 190 F.2d 191 (5th Cir.), *on reh'g*, 191 F.2d 705 (1951), *cert. denied*, 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 687 (1952).

8. 159 Tex. 500, 324 S.W.2d 167 (1958).

called for coastal shorelines to be determined with reference to mean high water levels, consistent with our opinion in *Luttes*.[9] Nevertheless, in 1993, the Commissioner of the General Land Office hired Darrell Shine to survey the eastern boundary of the Foundation's property based on ground conditions, not water levels. Shine had never been an advocate of using mean high water levels to locate the shoreline as prescribed by *Luttes*, and he did not use that method to locate the boundary of the Foundation's property. Instead, Shine located the boundary where he found the terrain to change in elevation and condition. After the survey was completed, the Commissioner changed state surveying regulations to allow shoreline boundaries to be placed at vegetation lines rather than mean higher high water levels.[10] This litigation began about the same time.

The Foundation has relied on a survey begun in 1984 by Matt Claunch and Bill Lothrop. They used high water measurements, but instead of picking a particular mean level shown by the data, which they feared the State might later contest on accuracy as opposed to methodology, thereby necessitating another expensive survey, they used a level higher than any the State could ever prove. The higher the level, of course, the better for the State. They surveyed the area on the assumption that the mean high water level was one foot above the National Geodetic Vertical Datum of 1929 (NGVD). All of the area on the east side of the Foundation's property, from the upland to the west bank of the Intracoastal Waterway, is undisputedly above that level. After this litigation commenced, the Foundation commissioned an oceanologist, Dr. Reinhard

Flick, to determine the actual mean daily high water level adjacent its property. Using data from several tidal gauges in the Laguna Madre, he calculated a mean and then adjusted it for the standard 18.6–year tidal epoch. By Flick's calculations, the mean daily high water level adjacent the Foundation's property is between 0.60 and 0.75 foot above the NGVD.

At trial, the State challenged Flick's "simultaneous comparison" methodology for comparing readings from tidal gauges, but the focus of the State's position was on the feasibility of using water levels to find a shoreline boundary in this area of the Laguna Madre. Shine testified that he had determined the boundary of the Foundations's property based on his observation of changes in the terrain and on the historical record. He conceded that the bluff line where he placed the boundary was not "regularly covered and uncovered on a daily basis by the waters of the Laguna Madre." Indeed, another of the State's principal witnesses testified that water reaches the bluff line no more than once or twice a year and then only for a few hours or days. But there was also uncontroverted evidence that some areas between the bluff and the Intracoastal Waterway were inundated as much as forty percent of the year.

The jury found that the Claunch/Lothrop line is at or above mean daily higher high tide, as the State concedes it is. Yet in answer to the question whether mean higher high tide could be determined with reasonable accuracy in this area of the Laguna Madre, the jury answered "no". The jury also found that the Shine survey accurately marked the boundary of the Foundation's property and failed to find that the Claunch/Lothrop line did so. Af-

---

9. 20 Tex. Reg. 3320, 3320–3321 (May 5, 1995) (proposing amendment to 31 Tex. Admin. Code § 7.2); *id.* at 4349 (June 13, 1995) (adopting proposed amendment).

10. 20 Tex. Reg. 3320, 3320–3321 (May 5, 1995) (proposing amendment to 31 Tex. Admin. Code § 7.2); *id.* at 4349 (June 13, 1995) (adopting proposed amendment).

ter the verdict, the trial court issued two opinions explaining that while he had come to believe that the Foundation's claims were precluded by *Humble*, even though he had denied the State's motion for summary judgment urging preclusion, he would render judgment on the verdict for the State.

The court of appeals affirmed.[11] In essence, the court concluded that *Luttes* does not preclude a determination of shoreline boundaries without reference to water levels, and that there was evidence, historic and current, to support the jury's finding that the Shine line was accurate.

We granted the Foundation's petition for review.[12] In extensive briefing, the parties have raised two principal issues: whether and how *Luttes* applies here, and whether the Foundation's claim is precluded by *Humble*. We turn first to *Luttes*.

## II

The Foundation and the State agree that the result in the present case depends heavily on how we read our decision in *Luttes*, and they have accordingly focused their attentions on this issue. They vigorously disagree over whether *Luttes* was correctly decided, whether it applies, and what it means. In fairness to all of these arguments, we first explain our understanding of *Luttes* with a far more excursive recitation of its text than we would ordinarily use so that what we think is its clear import will emerge from the words themselves. Then we will examine the parties' arguments about its application to their dispute.

## A

In 1953, J.W. Luttes successfully petitioned the Legislature to allow him to sue the State to determine title to some 3,400 acres of mud flats in the Laguna Madre on the east side of his property in Cameron County,[13] about forty miles south of the Foundation's property in the present case.[14] His predecessor's original 1829 grant, known as Potrero de Buena Vista, was to the westerly "shore" of the Laguna Madre.[15] Luttes contended that while the shoreline boundary had originally and for many years been a bluff beyond which the mud flats were then completely submerged, more recently the area to the east had risen in elevation because of accretion due to deposits of silt over the years, and therefore he was entitled to the additional property.[16] The trial court made two important determinations, one of law and one of fact. The court concluded as a matter of law that under the applicable civil law of Mexico, Luttes's shoreline boundary ended at the highest level water ever reached. The court found as a matter of fact, after a bench trial, that Luttes had not proved that any elevation in the area was due to accretion. On appeal, Luttes complained that the trial court had misconstrued the civil law and that its failure to find accretion was against the great weight and preponderance of the evidence.[17] The court of

11. 994 S.W.2d 285 (Tex.App.-Austin 1999).

12. 43 Tex. Sup.Ct. J. 301–302 (Jan. 13, 2000).

13. 289 S.W.2d 357, 357 (Tex.App.-Waco 1956), *rev'd and remanded*, 159 Tex. 500, 324 S.W.2d 167 (1958), *on remand*, 328 S.W.2d 920 (Tex.App.-Waco 1959, no writ).

14. *See* 159 Tex. 500, 324 S.W.2d at 168.

15. *Id.* at 169.

16. *Id.*

17. 289 S.W.2d 357, 374–375 (Tex.App.-Waco 1956), *rev'd and remanded*, 159 Tex. 500, 324 S.W.2d 167 (1958), *on remand*, 328 S.W.2d 920 (Tex.App.-Waco 1959, no writ).

appeals affirmed.[18]

This Court reversed and remanded, concluding that the court of appeals had indeed misconstrued the civil law and that that error may have affected its assessment of the evidence of accretion.[19] In a lengthy opinion, Justice St. John Garwood began by describing the area of the Laguna Madre in dispute.

The surface of the area in question, including the disputed 3,400 acres, has the characteristics of a basin, or, more accurately, a series of small basins running roughly from a point half a mile or so off the northerly portion of the base line of the triangle in a southeasterly direction across the middle of it. The lower levels of these basins are between 0.25 and 0.40 feet above mean sea level (slightly below "mean high tide") and cover a substantial part of the acreage claimed by the petitioners-plaintiff; but the bulk of the latter and of the whole 4,000–acre triangle lies above the 0.40 foot contour, rising generally toward the sides, along which, including the mainland side, it is largely between 0.80 feet and 1 foot above mean sea level, or about 0.50 feet above the level of "mean high tide".

[On the flats,] there is no vegetation except algae, which does not have the appearance of normal vegetation and forms a sort of thin darkish mat over the surface, drying up and cracking in the frequent periods when the flats are free of water.... The soil of the flats is evidently of a darker and muddier appearance and character than the sand which comprises the flats and beaches of Padre Island several miles across the Laguna to the eastward. At least when the area is free of water, fairly heavy motor vehicles can be driven over most of it without difficulty. At the same time, and apart from the matter of the algae, it has many characteristics of land that is periodically covered by sea water, including a perennial dampness, presence of numerous salt crystals, sea shells, remnants of fish and so on, while water can evidently always be reached by digging a foot or two below the surface.

Where the flats join the mainland and the islands there is an abrupt change in the angle of elevation and the character and appearance of the soil, including a well-marked beginning line of sand, followed by grass and vegetation. This line, so far as it lies along the established mainland, is consistently referred to by the petitioners-plaintiff themselves as a "bluff" or "bluff line", and evidently is considered by them to have been the undoubted seaward limit of the Buena Vista grant at least up until the early part of the present century.[20]

Regarding the nature of the seawater inundation of the Laguna Madre, the Court explained:

As found by the trial court, and admitted by the parties to the suit, there is in the Laguna Madre relatively little tide in the true sense, although there are undoubtedly substantial and frequent, but irregular, variations in water levels during each day or longer period due to the influence of non-astronomical forces and conditions, sometimes in combination with astronomical tide conditions in the Gulf of Mexico. One of the factors causing, or substantially contributing to, higher water levels in the general area in suit is the presence of northerly winds in the period from early Fall to Spring,

18. *Id.*

19. 159 Tex. 500, 324 S.W.2d at 187, 191.

20. *Id.* at 171.

although, on the other hand, there have been recent instances of sea water over-running the flats in midsummer. There is also present, and due in at least some part to astronomical forces, a progressive, slow rise over the years of the general ("mean") sea level at an average rate of about 0.02 feet per year.[21]

Against this backdrop, the Court began:

We granted the writ of error largely in the hope of being able to eliminate the confusion that appears to exist at the Bar and otherwise as to what, in details of practical application to cases like the present, is the correct definition of the shore—the matter being obviously one of considerable public importance. We shall accordingly discuss that question first.

We harbor no doubt that the Mexican (Spanish) law, whatever it may be, in effect at the date of the grant, is what must furnish the applicable rule, and that such is the effect of every decision, observation or assumption that has ever been made by this Court on the subject. . . . [22]

Turning to the body of civil law, we stated:

The basic definition [of shore], of course, is that of the celebrated body of Spanish law known as *Las Siete Partidas*, which was evidently written in the 13th century and promulgated some three centuries later, and of which the critical portion of Partida 3, Title 28, Law 4 (from the so-called Lopez edition published at that time under governmental auspices at Salamanca) reads as follows:

"* * * e todo aquel lugar es llamado ribera de la mar quanto se cubre el agua della, quanto mas crece en todo

el ano, quier en tiempo del inuierno o del verano." [23]

After surveying the several different interpretations of this passage over the centuries and noting the expert testimony offered by Luttes and the State on its meaning, we reasoned that both the *Partidas* and common sense contemplated a shoreline where water was, on the average:

Now whether the language confines the shore to that area regularly covered and uncovered by "tide" in the astronomical sense or permits it to be that highest "swell", wave or rise that may occur at this or that one particular hour or minute from whatever force other than storm conditions, the phrase, "in all the year" (en todo el año), undoubtedly leaves a question as to *what year* is meant. Does it mean the last calendar year expiring before the litigation or other effort to fix the boundary on the ground, or some earlier year with a higher water level, or the kind of average of single highest annual levels over several years, on which the trial court alternatively relied in the instant case, or does it mean that where the *daily* highest levels over a period of years are of record and in evidence, these hundreds or thousands of highest levels should be averaged, and the average taken to be "however most it grows *in all the year*"?

Pretermitting for the moment the matter of interpretive authority, we think the language of the *partidas* of itself permits, and common sense suggests, a line based on a long term average of daily highest water levels, rather than a line based on some theory of occasional or sporadic highest waters.

---

**21.** *Id.* at 173.

**22.** *Id.* at 175–176.

**23.** *Id.* at 177.

Indeed, such appears to us to be consistent with one of the primary arguments of the State itself to the effect that the true line should be one evidenced by more or less permanent markings on the ground of the kind ordinarily associated with the upper line of a shore. Whatever the aspect of the ground in the instant case, ordinarily a "shore line" is one characteristic of regular and frequent coverage by the sea, which in turn is much more closely related to an average of daily highest waters than to one, or an average of merely a few, highest annual readings.

While obviously the word, "average", or its equivalent, "mean", does not occur, both are suggested by the language as a whole, as the learned trial judge evidently recognized. No particular year being indicated as that from which the so-called highest tide or water "in all the year" is to be taken, the inference is that a condition regularly prevailing over a number of years is what was intended, and this in turn suggests a mean taken over such a period. If, for example, the single highest water for each of the five years immediately prior to the litigation were in no instance higher than one foot above mean sea level, but were somehow shown to be three feet in one particular year long prior to the latest five years, it would hardly appear within the reasonable intendment of the law that we should forget the later years and fix the line at three feet according to the one more remote year. Conversely if the single highest reading for the year just preceding the trial were two feet, while those for each of nine or more years preceding the latest were not over one foot, it would seem unreasonable to require fixing the line at the two-foot level of the latest year, disregarding the lower "highest" levels of all the preceding years. And if we are to use some kind of "mean", as evidently we should, what is there in principle, or in the words of the basic law itself, to require such an average to be that of single highest annual readings for each of the several years in question, rather than one of daily highest readings for all of the days of such years? Both are averages of *highest water readings*. The only difference lies in the number of highest readings averaged.[24]

That difference might be trivial on a shore exposed to the open sea and astronomic tidal forces. There the mean high water level is not likely to vary much whether readings are taken daily, weekly, or monthly. But the difference due to the interval over which readings are taken can be substantial in an area like the Laguna Madre which is inundated and dry for days at a time. For several days the water at a given spot may be a foot deep, while on other days the place is completely dry. To locate the shoreline at the highest annual water level in this area of the Laguna Madre, we reasoned, would mean that most of the time no water was present there at all.

> Thus should we base the line, as did the court, on these few exceptional levels, we are likely to have a line of shore which is not shore in the commonly accepted sense of being *regularly* covered and uncovered by water. It is difficult to believe that the ancient writers of the *partidas* had in mind a shore which was different from the commonly accepted idea thereof. One thinks of shore more in terms of the water's edge than in terms of land which is only occasionally

24. *Id.* at 179.

and irregularly inundated.[25]

But how to obtain the water level data to be averaged when tidal gauges, though scattered along the Texas coast, were often far apart? One way would be to obtain evidence from sources less reliable than tidal gauges. Another would be to abandon the mean high water level measurement altogether and simply rely on eyewitness testimony to establish high water levels. We rejected both.[26] Instead, we explained:

> A third and much more reliable alternative, however, is that of following the system of "mean high tide (water)", which in effect is but the average of highest water of each day rather than each year. If that rule is adopted, we can have, by installing a tide gauge for as little as one year near the area in question, the benefit of 365 highest readings upon which to base an average, that is, upon which to determine "mean high tide (water)" at that point for that one year. This mean level will obviously vary less from a corresponding level for earlier (or later) years than would a single highest annual level for one year vary from the respective highest annual levels of other years. Indeed, as before stated, upon the further and quite simple step of correction against the nearest tide gauge which has been in operation for the full 19–year tidal cycle, the one-year "mean high tide (water)" figure of the local gauge will reflect with reasonably close exactness the "mean high tide (water)" for the whole 19–year cycle. In other words, so far as most of the Texas coast is concerned, the only reliable way in which to obtain any sort of average of

highest water levels is by use of the standard of "mean high tide (water)".

> While this involves a delay of a year, it appears more practical than waiting several years in order to get an average of single highest annual waters over the longer period. In either event, the local tide gauge is necessary because, as stated, water levels vary considerably from place to place in the Laguna, particularly on account of varying exposures to meteorological forces, whereas, by adopting the "mean high tide (water)" standard, the period of tide gauge operation may be reduced to one year.[27]

* * *

Once we elect for an average, as the practicalities seem to require, and the texts of neither the Roman Civil Law nor the *partidas* appear to forbid, the sounder course is to take the average of *daily* tide gauge readings of daily highest water, be it tide or a wind-driven wave.[28]

We rejected the highest water level rule announced in *Humble* as being an incorrect interpretation of the civil law, and we found nothing in the law of other states to contradict our reading of the *Partidas*. Finally, we rejected the argument that fixing the shore at the level of mean daily high water was unfair to the State and instead stressed the importance of actually ascertaining water levels as opposed to relying on testimony adduced for litigation.

Theoretically, the rule of mean high tide is less favorable to the State in its capacity as a landowner than a rule based on a single instance of highest annual water or a mean of several such instances. But that is not a reason for

25. *Id.* at 180.

26. *Id.*

27. *Id.* at 181.

28. *Id.* at 182 (emphasis added).

our interpreting the law differently than we would if only private interests were involved. Moreover, we are far from sure that in actual practice the rule of mean high water is less favorable than a rule calling for a higher shore line that will always be vague and difficult of ascertainment until finally fixed on the ground after extended and complicated litigation. A result of the latter kind of rule may well be to give the abutting private landowner (and his mineral lessee) an advantage over the State in the inevitable litigation, because he has longer and better access to the kind of proof that will necessarily be involved in demonstrating whether on such and such an occasion in such and such a year or years one or more "highest waves" actually reached this or that irregular line on the ground. Another result may be to discourage the mineral leasing of tidal areas from the State by smaller operators who cannot run the risk of complicated boundary litigation in addition to the other risks of mineral exploration.[29]

Concluding our analysis of the civil law, we specifically held "that the applicable rule of Mexican (Spanish) law [in determining a shoreline] is that of the average of highest daily water computed over or corrected to the regular tidal cycle of 18.6 years."[30] Concerned that the court of appeals' mistaken interpretation of the civil law might have influenced its assessment of the evidence of accretion, we remanded the case for a factual sufficiency review in light of the announced rule of law.[31]

On rehearing, we acknowledged that a mean daily high water level might be determined otherwise than by tidal gauges, but we did not retreat from our conclusion that the civil law placed the shoreline at that level, and we specifically rejected the argument that the shoreline could be located at an "obvious" bluff line, which we had already remarked was not really very obvious.

Whatever may be the case as to that part of our shores governed by the Anglo–American rule of mean high tide, we do think it correct to say that the Spanish (Mexican) law concept of the shore is the area in which land is regularly covered and uncovered by the sea over a long period. If it be shown in a given case that the upper level of the shore, as actually covered and uncovered by the sea, is higher (or lower) than the level of mean higher high tide as determined by tide gauges, and if it also appears that an upper median line of the shore, as actually so regularly covered and uncovered, can be determined with reasonable accuracy otherwise than by exclusive resort to tide gauges, we do not by our opinion intend to foreclose such a case.

In the instant case, it is quite plain to us that the area in suit is not regularly covered and uncovered by the Laguna waters and has not been for a long time. To say that merely because there exists, at the western edge, a "bluff line" or a "vegetation line", marking where the waters at some undisclosed period in the past evidently did reach with regularity, the latter line is the line of mean higher high tide, would, in our opinion, be much less reasonable than to fix a line of mean higher high tide by exclusive resort to tide gauges.[32]

To eliminate any dispute over what we had determined to be the civil law rule for

---

29. *Id.* at 186–187.

30. *Id.* at 187.

31. *Id.* at 191.

32. *Id.* at 192.

determining shorelines, the dissent articulated what the Court had rejected:

> The shoreline should be determined according to the civil law. This line cannot, under any circumstances, be accurately determined by the use of the tide gauge. According to the provisions of Las Siete Partidas, the seashore is the land that is covered with water from time to time. The Spanish verb "cubrir" is used, which means "to cover". The seashore, then, is that portion that is alternately covered and uncovered by the sea. The height of the water on the tide gauge is not the same as the height of the water that rolls up or is blown up on the shore. The tide gauge might be used to establish prima facie the location of the shoreline, but it should always be held to only be prima facie evidence of the true line. Such presumptive evidence may be destroyed by the facts. In other words, the question of the location of the shoreline is one of fact and not one of law. There is nothing in the Partidas definition dealing with tide gauge.... The tide gauge would be wholly inaccurate to establish the true seashore line.[33]

\* \* \*

It seems to be unassailable that the civil law contemplated ["shore" to mean] the area actually reached by the sea, though only a single swell. If the tide gauge is accepted as the absolute determinate in placing or locating the shoreline, then we are establishing a rather artificial line.[34]

From *Luttes,* the following propositions may fairly be said to be established:

*First: Luttes* purports to, and does, generally determine shoreline boundaries under the civil law. It is not limited to the facts of Mr. Luttes's case. As the Court said: "We granted the writ of error largely in the hope of being able to eliminate the confusion that appears to exist at the Bar and otherwise as to what, in details of practical application to cases like the present, is the correct definition of the shore— the matter being obviously one of considerable public importance."[35]

*Second:* The general conditions in the Laguna Madre east of Luttes's property in the 1950's are no different from those east of the Foundation's property now, only forty miles away: seawater inundation is regular, shallow, and somewhat infrequent, and it is caused mostly by seasonal meteorological forces but nevertheless affected slightly by daily astronomic forces.

■ *Third:* The boundary of original civil law grants must be determined by that law, not subsequent surveys or the conduct of the grantees or their successors.

■ *Fourth:* A shoreline boundary cannot be determined without water level measurements, even if no tidal gauges have historically been placed adjacent the property, and even if those measurements are made for no reason but to determine a boundary over as short a time as a year. An historic bluff line does not mark a civil law boundary.

■ *Fifth:* The relevant water level measurement is not the highest level that water ever reaches but a mean level.

■ *Sixth:* The mean should be calculated on a daily basis, even if the daily change in water levels caused by atmospheric tidal forces is very small.

---

**33.** *Id.* at 196–197 (Smith, J., dissenting).

**34.** *Id.* at 197 (Smith, J., dissenting).

**35.** *Id.* at 175–176.

This is our understanding of *Luttes,* and with it we turn to the parties' arguments in this case.

### B

We consider first the State's arguments.

### 1

The State argues that *Luttes* misconstrued the *Partidas.* Properly interpreted, the State says, the civil law placed shorelines at the highest water levels reached in ordinary storms, not at mean daily high water levels. The State tells us that while "[t]he proper construction of [the *Partidas* ] was extensively briefed by the parties in *Luttes,* by some of the best lawyers then practicing in this state", the evidentiary record on the subject was limited. In this case, the State says,

> the parties retained some of the foremost experts on ancient Spanish law to give their own reports on the proper construction of the *Partidas:* Professor Saul Litvinoff, of Louisiana State University, and Professor Jose Luis Soberanes Fernandez, of the Universidad Nacional Autonoma de Mexico, for the State, and Professors Hans Baade and Guillermo F. Margadant, both of the University of Texas, for the Petitioners.

Based on this evidence, the State argues, the Court should reexamine *Luttes* 's interpretation of the civil law.

We accept all of the State's premises. The meaning of the civil law was in fact extensively briefed in *Luttes* by some of the best lawyers in Texas, and we hasten to add that the subject has been given an even more thorough treatment in the present case by lawyers every bit the equals of counsel in *Luttes.* In both cases the Court has had benefit of the views of a truly

formidable array of scholars on the civil law, although in *Luttes* reference was to texts unaided by the kind of expert testimony adduced in the present case. But nothing in the record and argument now before us convinces us that we should reconsider the rule determined in *Luttes.* On the contrary, the record in this case makes even more apparent the uncertainty in interpreting the *Partidas;* the State's evidence and arguments for a different rule are persuasive, but so are the Foundation's evidence and arguments for the rule of *Luttes.* It is simply impossible to know for certain how eighteenth-century Spain and Mexico would have applied their thirteenth-century law for determining shorelines in the difficult context of the Laguna Madre.

The Court's interpretation of the civil law in *Luttes* is reasonable and workable, and it has provided a rule for determining boundaries for more than forty years. While we recognize that the subject is not beyond reconsideration, *stare decisis* is never stronger than in protecting land titles, as to which there is great virtue in certainty.[36] We would be very reluctant to discard a rule determining seashore boundaries that has served as long and satisfactorily as the rule in *Luttes,* thereby upsetting long-settled expectations, and we could not do so absent far more compelling evidence than can be offered here.

■ Accordingly, we reaffirm that shoreline boundaries in civil law land grants must be determined with reference to measured mean daily high water levels.

### 2

The State argues that the rule of *Luttes* applies only when the shoreline is claimed to have moved over time because of accre-

---

**36.** *Marmon v. Mustang Aviation, Inc.,* 430 S.W.2d 182, 193 n. 3 (Tex.1968); *Cross v.* *Wilkinson,* 111 Tex. 311, 234 S.W. 68, 70 (1921).

tion or reliction. It is true, of course, that Luttes himself made such a claim. It is not true, however, that the civil law determined in *Luttes* was in any way dependent on the occurrence of accretion or reliction. What *Luttes* established was nothing less than "the applicable rule of Mexican (Spanish) law" for determining seashore boundaries.[37] An interpretation of the civil law, we held, was necessary to understanding Luttes's claim of accretion, not vice versa. The rule of *Luttes* applies whenever a civil law shoreline boundary is in question.

### 3

■ The State next argues that the rule of *Luttes* should not be applied in this case because its result is contrary to the surveys of the grants at the time they were made and for a century afterward, and to the uniform understanding of the Foundation's predecessors in interest until at most the past few decades. For two reasons, we do not agree.

■ First, it is firmly established that

[t]he rules for the construction of grants, and for ascertaining their boundaries, which have from time to time been announced by the court and have been acted on in establishing their lines, are all designed for the purpose of carrying out the intention of the grantor. When this intention is once made manifest, all else must yield to and be governed by it.[38]

The intent of Spain and Mexico in granting land to the Foundation's predecessors must be determined by reference to those sovereigns' policies and laws at the time of the grants.[39] A survey may, of course, give some indication of a grantor's intent,[40] but when the grant calls for a natural monument as a boundary—here, "the waters of the Laguna Madre"—that monument controls over courses and distances determined by survey.[41] Generally, a surveyor's meander lines along a water line do not mark the boundary.[42] We have determined what the intent of Spain and Mexico was by interpreting their law, the *Partidas*, in *Luttes*. That their grantees and surveyors may have had a different understanding must be, and has been, considered in interpreting the civil law. In other words, an interpretation of controlling eighteenth century civil law must take into account how it was understood by those who applied it at the time, including the original grantees and surveyors of the property at issue here and those who succeeded them. But having determined what the applicable civil law was, as we have in *Luttes*, after taking all such considerations into account, we cannot then refuse its application where there happens to be evidence that particular grantees and surveyors had a different understanding of the law. Their misunderstanding of the applicable law cannot diminish the grantors' grants any more than it could enlarge them. The civil law does not locate "the waters of the Laguna Madre" at one place when there is no evidence of any contrary understanding by owners and surveyors

37. *Luttes,* 159 Tex. 500, 324 S.W.2d at 187.

38. *Woods v. Robinson,* 58 Tex. 655, 660–61 (1883); *accord, Wheeler v. Stanolind Oil & Gas Co.,* 151 Tex. 418, 252 S.W.2d 149, 152 (1952).

39. *See State v. Balli,* 144 Tex. 195, 190 S.W.2d 71, 86 (1944).

40. *See Fulton v. Frandolig,* 63 Tex. 330 (1885).

41. *See Howland v. Hough,* 570 S.W.2d 876, 882 (Tex.1978).

42. *Stover v. Gilbert,* 112 Tex. 429, 247 S.W. 841, 843 (1923).

and at another place when there is such evidence. The civil law, as we have interpreted it, defines the monument without regard to private understanding.

Second, the historical record is ambiguous because of the different motives of the actors over time. We noted in *State v. Balli*, regarding the title to Padre Island, that surveys were often made to determine what dues were to be paid the sovereign or what land was usable for grazing rather than to ascertain boundaries for title purposes.[43] Unquestionably, the first grantees' principal concern was land suitable for grazing. That explains Balli's petition for the Mesquite Rincon adjacent the Big Barreta and de la Fuente's adjustment to the survey of the Little Barreta. Both were to ensure that the owners possessed grazing land. The State argues that because the Mesquite Rincon lies wholly within the area now in dispute, if Balli owned it by virtue of his grants, as the Foundation claims, he had no need to petition for it; therefore it must not have been included in the grants any more than any other area east of the bluff line. Whatever Balli's intent may have been by his petition—whether to acquire the Mesquite Rincon that he did not own, or merely to confirm his ownership of grazing land in an area he already owned where grazing was for the most part impossible—we cannot regard his intent as limiting the Spanish grant. Nor can we determine the sovereign's intent in granting Balli's petition for the Mesquite Rincon, apart from the govern-

ing civil law, other than to confirm his ownership of its grazing land.

In sum, the Foundation's eastern boundary—"the waters of the Laguna Madre"—is fixed by the civil law in effect when the original grants were made and can neither be enlarged nor reduced by the parties' misunderstanding of that law at that time or since. This is not, of course, a case in which an owner is claimed to have abandoned property or in which a challenger claims adverse possession; this is a case construing a call for a natural monument in an original grant. The relevance of the historic record offered by the State is in determining the applicable law. Once that law has been determined, however, as it has been in *Luttes*, it can neither be enlarged nor diminished by private understanding.

4

The State argues that the rule determined in *Luttes* cannot practically or sensibly be applied in the area of the Laguna Madre east of the Foundation's property because of the conditions there. As the State points out, the jury found that mean higher high tide could not be determined with reasonable accuracy there. But it is plain from our opinion in *Luttes*, as well as from the trial court's findings of fact in that case extensively recited in the court of appeals' opinion,[44] that the only appreciable difference in the Laguna Madre at the two locations is that water "always" or "completely" covered the area east of Luttes's property[45] while inundation east

---

**43.** *State v. Balli*, 144 Tex. 195, 190 S.W.2d at 97.

**44.** *Luttes v. State*, 289 S.W.2d 357, 361–374 (Tex.App.-Waco 1956), *rev'd and remanded*, 159 Tex. 500, 324 S.W.2d 167 (1958), *on remand*, 328 S.W.2d 920 (Tex.App.-Waco 1959, no writ).

**45.** *See* 159 Tex. 500, 324 S.W.2d at 169 ("At the date of the grant, and, indeed, for well

over half a century thereafter, the area in suit was always covered by the waters of the Laguna"); *cf.* 289 S.W.2d at 373 ("in 1829 the waters of the Laguna Madre completely covered the lands in controversy at the time of the original Mexican grant involved in this suit, or at least if not completely covered at all times, such area was a part of the bed or shores of the Laguna Madre").

of the Foundation's property may have been less frequent or less complete. Otherwise, the nature of seawater inundation in the disputed area in *Luttes* appears to have been essentially identical to inundation in the disputed area here. Given that mean higher high water could be determined in *Luttes* and that the evidence in the present case establishes that the conditions in both cases are essentially the same, as a matter of law mean higher high water can be determined in the present case.

The State argues here that the shoreline east of the Foundation's property is marked by an obvious "bluff"—a slight rise in elevation—and a change in vegetation and terrain. But the State made the identical argument in *Luttes*. The evidence in the present case is that water reaches the bluff line at most once or twice a year. The evidence in *Luttes* was comparable. Evidence of the number of days of any inundation of the mud flats, even east of the bluff line, is also comparable in both cases.[46] Daily astronomic forces were no stronger in the Laguna Madre near Luttes's property than they are near the Foundation's property. There were no tidal gauges in the immediate vicinity of Luttes's property, just as there are none near the Foundation's property.

The State argues that under such conditions, when inundation is regular but shallow and infrequent, it makes no more sense to determine the presence of water using mean water levels measured on a daily basis than it does to describe the climate of Corpus Christi by saying that its mean daily temperature is 72°F. But the State made this same argument in *Luttes*, and we expressly rejected it there. It makes less sense to determine a shoreline based on the highest level water ever reaches in a year, just as it does not accurately describe the Corpus Christi climate to say that it was 109°F there on September 5, 2000. The infrequency of seawater inundation in areas of the Laguna Madre, like those adjacent Luttes's and the Foundation's properties, makes any shoreline determination a difficult exercise. But here, as in *Luttes*, the exercise is made no easier by basing the boundary determination on a surveyor's subjective observations of the terrain. For certainty in land titles, it is important to have a rule, and the civil law as interpreted in *Luttes* provides one.

The State argues that mean daily high water level measurements should not be used to determine a "shoreline" in the Laguna Madre adjacent the Foundation's property because such measurements are so difficult and meaningless that after 1995 the National Oceanic and Atmospheric Administration abandoned any effort to make them. But the civil law rule determined in *Luttes* predated NOAA and its predecessor, the United States Coast and Geodetic Survey, by more than a century, and the Survey was mentioned in *Luttes* only in passing. Application of the rule of *Luttes* is not dependent on NOAA or its policies or the nearby installation of tidal gauges, whether private (as one was in *Luttes*)[47] or governmental.

The State argues that the impossibility of measuring mean daily high water levels in the Laguna Madre is demonstrated by the Foundation's efforts to do so and its retreat to the position it has taken in this litigation that the applicable level is not a measured one but an arbitrary one—one foot above the National Geodetic Vertical Datum of 1929—that is higher than any that could be measured and which conve-

---

46. *See Luttes*, 289 S.W.2d at 367.

47. *Luttes*, 159 Tex. 500, 324 S.W.2d at 173.

niently (for the Foundation) intersects the west bank of the Intracoastal Waterway. But the evidence is undisputed that high water levels *can* be measured daily wherever in the Laguna Madre one chooses to do so, that those measurements can be averaged to obtain a mean, that the Foundation's experts have performed such measurements and calculations, and that the mean level obtained by that process is below—and therefore more favorable to the Foundation—the level it claims. The jury's failure to find that mean daily high water levels can be determined with reasonable accuracy does not detract from the established fact that such levels, even if inaccurate, are below any level that would locate the Foundation's boundary on the west bank of the Intracoastal Waterway. The Foundation explains that it has advocated a mean daily high water level that is several inches above the calculated level and therefore favorable to the State in order to avoid disputes over the accuracy of the measurements that were made. Whether this explanation is true or not, the evidence is that the Foundation has measured mean daily high water levels, and the State concedes that those measurements would place the boundary at the same place—the west bank of the Intracoastal Waterway.

The State urges, however, that but for the presence of the Intracoastal Waterway, the Foundation's measurements could not be used to locate an eastern boundary to its property west of Padre Island, and therefore it would own all the land eastward to the Gulf of Mexico. This is simply incorrect. It is true that the dredging of the Intracoastal Waterway in 1949, so that water is always present there, did not create an eastern boundary for the Foundation's property. But it is also true that seawater inundated the Laguna Madre

east of the Foundation's property long before the Waterway existed, at least to the time of the original grants. The grants themselves called for a boundary at "the waters of the Laguna Madre". As long as water was sometimes present at some level between the Foundation's property and Padre Island, the reach of mean high water level on the upland—which is the boundary line under civil law—was somewhere west of the Island. The Foundation concedes that it cannot say now where that boundary was many decades ago, but it need not do so. The State's argument is that mean daily high water level measurements cannot be used to locate a viable boundary west of Padre Island in the absence of the Intracoastal Waterway, and that argument is simply incorrect.

### 5

Finally, the State argues that the Court's opinion on rehearing in *Luttes* itself recognized that circumstances might exist in the Laguna Madre where shoreline boundaries could *better* be determined without reference to mean daily high water level measurements. We do not share this reading of our opinion. All we said on rehearing was that

> [i]f it be shown in a given case that the upper level of the shore, as actually covered and uncovered by the sea, is higher (or lower) than the level of mean higher high tide as determined by tide gauges, and if it also appears that an upper median line of the shore, as actually so regularly covered and uncovered, can be determined with reasonable accuracy otherwise than by exclusive resort to tide gauges, we do not by our opinion intend to foreclose such a case.[48]

But in so doing we did not create an exception to the rule we had determined

48. *Id.* at 192.

under the civil law that a "median line" must be determined. Indeed, it would have made no sense for us to have held that a civil law shoreline must be determined by daily water level measurements and then stated on rehearing that any other method was acceptable, too. Had that been our intent, we would have withdrawn our rejection of the bluff line boundary. Moreover, in the two sentences immediately following the sentence just quoted, we reiterated our rejection of a rule that would locate a water-line boundary at a bluff water rarely reached:

> In the instant case, it is quite plain to us that the area in suit is not regularly covered and uncovered by the Laguna waters and has not been for a long time. To say that merely because there exists, at the western edge, a "bluff line" or a "vegetation line", marking where the waters at some undisclosed period in the past evidently did reach with regularity, the latter line is the line of mean higher high tide, would, in our opinion, be much less reasonable than to fix a line of mean higher high tide by exclusive resort to tide gauges.[49]

The bluff line boundary the State urges in the present case is indistinguishable from the bluff line boundary it urged in *Luttes,* and its argument is therefore foreclosed by our decision in that case.

## C

Having rejected the State's arguments regarding the application of *Luttes* in this case, we turn briefly to the Foundation's position. The evidence establishes, and the State concedes, that the Claunch/Lothrop line on which the Foundation relies was at or above mean daily high water levels. The evidence also establishes that those levels were susceptible of being determined in the Laguna Madre east of the Foundation's property. Thus, the jury's findings are superfluous and the boundary can be located as a matter of law using the rule of *Luttes* at the Claunch/Lothrop line, which has the same effect as using a mean daily high water line of one foot above the NGVD.

## III

The State also argues that the Foundation's claims in this case are barred by res judicata and collateral estoppel—often more usefully referred to, respectively, as claim preclusion and issue preclusion—based on the federal trial court's findings and the Fifth Circuit's holdings in *Humble Oil & Refining Co. v. Sun Oil Co.,* decided in 1951.[50] In *Humble,* as we have already said, Sun Oil, the State's mineral lessee in a part of the mud flats at issue in the present case, sued the Foundation's predecessors in interest and their mineral lessee, Humble Oil, to determine whose lease was valid. The district court permitted the State to intervene in the litigation as the competing owner to title to the land at issue,[51] but the Fifth Circuit reversed this ruling because the presence of the State as a party would defeat diversity jurisdiction on which the case was based.[52] The Fifth Circuit held that "[t]he trial court could not and did not acquire jurisdiction over the controversy between the State of Tex-

---

**49.** *Id.*

**50.** *Sun Oil Co. v. Humble Oil & Refining Co.,* 88 F.Supp. 658 (S.D.Tex.1950), *modified and aff'd sub nom. Humble Oil & Refining Co. v. Sun Oil Co.,* 190 F.2d 191 (5th Cir.), *reh'g denied,* 191 F.2d 705 (1951), *cert. denied,* 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 687 (1952).

**51.** *Sun Oil Co. v. Humble Oil & Refining Co.,* 88 F.Supp. 658 (S.D.Tex.1950).

**52.** *Humble,* 190 F.2d at 197–198.

as and the defendants"[53] and modified the judgment "so as not to be binding upon the State".[54] The federal district court concluded that Sun Oil's lease was valid, and the Fifth Circuit affirmed.

Not only were the leaseholds at issue in the federal case only about one-fifth of the land in dispute in the present case, the actual location of the boundary was not litigated. According to the Fifth Circuit, "[t]he defendants conceded that the land in controversy was a part of the bed of the Laguna Madre when their grants were issued, but claimed that its elevation had been increased" by accretion.[55]

> The crucial question for determination is whether land, which admittedly was a part of the original bed of Laguna Madre and outside of appellants' mainland grants, has become a part of the mainland under the doctrine of accretion. The burden of proving this was on appellants; and we think, upon the undisputed facts, that they failed to meet this burden.[56]

Thus, the parties in the federal case did not seek a determination of the original eastern boundaries of the Big Barreta and Little Barreta, and the federal trial and appellate courts did not adjudicate the issue.

The federal courts reasoned, however, much as this Court later reasoned in *Luttes,* that a determination of whether additional land had accreted to the property necessitated in part an understanding of what increase in elevation would be required for accretion, which in turn required some understanding of the concept of shoreline under the civil law. Recognizing that it was bound to follow Texas law on the subject, the Fifth Circuit held that "[b]y the civil law, the shore extends to the line of the highest tide in winter."[57] Texas law interpreting civil law shoreline boundaries was not settled at the time of the federal litigation and was not authoritatively determined until about six years later when this Court decided *Luttes.*[58] *Luttes* rejected the Fifth Circuit's interpretation of the civil law in *Humble.*[59]

■ We first consider whether the Foundation's claims in the present case are precluded by res judicata. In Texas, the preclusive effect of a federal judgment is determined by federal law.[60] Federal res judicata rules have been described by Professors Wright, Miller, and Cooper as "intricate".[61] Generally, however, the United States Supreme Court has explained that

> [t]he rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered

53. *Id.* at 197.

54. *Id.* at 199.

55. *Id.* at 193.

56. *Id.* at 199.

57. *Id.* at 195.

58. 159 Tex. 500, 324 S.W.2d at 185–186.

59. *Id.*

60. *Eagle Properties, Ltd. v. Scharbauer,* 807 S.W.2d 714, 718 (Tex.1990) ("federal law controls the determination of whether res judicata will bar a later state court proceeding").

61. 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4401, at 4 (2d ed.2002).

for that purpose."[62]

■ Under this rule, the *Humble* litigation does not preclude the Foundation's claims in the present case. The federal district court in *Humble* did not determine the eastern boundary of the Foundation's property and could not have done so. Not all of the area was involved in the case. The parties's dispute in *Humble* over the validity of competing mineral leases covered only a small part of the area in dispute in the present case. Sun Oil, the State's lessee, did not claim an interest in most of the land along the east side of the Foundation's property, and therefore could not litigate the boundary. The State, as we have said, was not a party to *Humble* because its intervention would have defeated diversity jurisdiction on which the action was predicated.[63] For this reason, the *Humble* litigation cannot be held to preclude the claims made in the present case.

■ As for whether collateral estoppel—the preclusive effect of the federal case on litigation of issues in the present case—is governed by federal or state law, we have previously concluded that both are the same.[64] Under both federal and Texas law:

> A party seeking to assert the bar of collateral estoppel must establish that (1) the facts sought to be litigated in the

second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.[65]

For the reason we have just explained, the facts concerning the Foundation's eastern boundary were not fully and fairly litigated in the *Humble* case. Only a fraction of the area on the east side of the Foundation's property was in issue. The central dispute was not over the civil law boundary in the original grants but over whether there had been accretion in the intervening years.

■ The importance of stability in land titles that moves us to adhere to the rule stated in *Luttes* does not require that we give the *Humble* litigation preclusive effect in this case. The facts regarding the Foundation's boundary were not determined in *Humble* and could not have been. The federal courts' interpretation of the civil law governing the original grants is not binding on us, and we rejected it in *Luttes*. Determinations of law are not generally given preclusive effect.[66]

Furthermore, to give the *Humble* case preclusive effect here would not serve the principles that preclusion serves.[67] In *Parklane Hosiery Co. v. Shore*, the United States Supreme Court stated that res judicata and collateral estoppel both serve "the

**62.** *Commissioner v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948) (quoting *Cromwell v. County of Sac*, 94 U.S. (4 Otto) 351, 352, 24 L.Ed. 195 (1876)); *accord*, *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) ("Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."); *see* WRIGHT, *supra* note 61, § 4406, at 140.

**63.** 190 F.2d at 197–198.

**64.** *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex.1990).

**65.** *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex.1994) (citing *Allen v. McCurry*, 449 U.S. 90, 94–95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1166 (5th Cir.1981); *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex.1990); *Tarter v. Metropolitan Sav. & Loan Ass'n*, 744 S.W.2d 926, 927 (Tex. 1988); and *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex.1984)).

**66.** *See* WRIGHT, *supra* note 61, § 4425.

**67.** *See Sysco*, 890 S.W.2d at 803.

dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." [68] Even if we were to hold that *Humble* determined title to part of the area now in dispute, it could not preclude litigation over the remainder of the area.

We therefore conclude that the *Humble* case does not preclude litigation of the title issues involved in the present case.

## IV

 The last issue we must address is whether the Foundation is entitled to recover its attorney fees. The only basis the Foundation claims for such recovery is the Declaratory Judgments Act, which authorizes an award of reasonable and necessary attorney fees when just and equitable.[69] We allowed attorney fees to be awarded against the State in *Texas Education Agency v. Leeper*,[70] which involved a challenge to legislative enactments, and the Foundation argues that we should also award fees here. But the dispute in the present case is over title, not an enactment, and the Foundation's claim for declaratory relief is merely incidental to the title issues. In such circumstances, the Act does not authorize an award of attorney fees against the State. Moreover, the provisions of the Natural Resources Code which permit the Foundation to sue the State in this case do not provide for recovery of attorney fees.[71]

## V

Finally, we add a brief word in response to the dissent.

The dissent's principal argument is that *Luttes* assumes that tide in the Laguna Madre can be measured, and "that assumption is no longer viable because we now have the undisputed fact that, as concluded by the federal government, the tide, at least in this part of the Laguna Madre, cannot be measured." [72] Without trying to put too fine a point on it, what we actually know from the federal government is that in 1995, thirty-seven years after *Luttes* was decided and shortly after this present litigation began, the National Oceanic and Atmospheric Administration, a bureau of the U.S. Department of Commerce, issued a report developed in cooperation with the Texas General Land Office, a party to the present case, in which it concluded, for purposes of commercial navigation and not for determining land titles, that regions of the Laguna Madre, including the area adjacent the Foundation's property "should be classified as ... non-tidal for tidal datum computation purposes according to operational criteria established by [the National Ocean Service] for tabulation of the tide" [73] because atmospheric forces too greatly affect water levels in the region for astronomic tides to be measured. The report was based not on any changes in conditions in the Laguna Madre—no one contends that there have been any changes in the region near the Foundation's property in two hundred years—but on what the report says is "the latest in a series of NOS efforts to understand the tidal char-

68. 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

69. TEX. CIV. PRAC. & REM.CODE § 37.009.

70. 893 S.W.2d 432, 446 (Tex.1994).

71. *See* TEX. NAT. RES.CODE §§ 33.171–.176.

72. Post at 292.

73. National Oceanic and Atmospheric Administration, Tidal Characteristics and Datums of Laguna Madre, Texas 1, 53 (July 1995).

acteristics of Laguna Madre, Texas".[74] The governing criteria of the report were not the provisions of early nineteenth century Spanish and Mexican civil law but recent NOS policies. The purpose of the report was not to fix land titles but to guide NOAA's tide tabulations. Yet the dissent argues that this report, written after this litigation began, in cooperation with one of the parties, using different criteria than those which determine this case and for different purposes supersedes *Luttes* and the civil law. Had the present litigation been concluded before the report issued, or had the report been withdrawn before this litigation concluded, the dissenting JUSTICES would presumably favor the Foundation's position. The dissent's position is that early nineteenth century Spanish and Mexican civil law and Texas land titles along the seashore fluctuate depending on NOAA's evolving understandings of tidal characteristics in the region. Because "[t]he federal government has declared as a matter of law that the tide cannot be measured,"[75] according to the dissent, the civil law regarding shorelines applied to these land grants from 1804 to 1995 and then stopped, shifting 35,000 acres from the Foundation to the State. With great respect for the power of the federal government, we do not agree that an agency's understanding of nature can alter history.

The conditions in the Laguna Madre in the region involved in the present case are the same as those in the region involved in *Luttes*. What the Foundation has measured—what NOAA has sometimes called "tide" and sometimes not—is precisely the mean daily high water level that *Luttes* says the civil law requires to be measured. Whether NOAA chooses to call such levels "tidal" as it did for many years, or to call them "non-tidal" as it has in its 1995 report, high water levels can be measured in the disputed area just as they could be measured in *Luttes*, and daily measurements can be averaged to get a mean, and that mean can be adjusted with actual and extrapolated data over a tidal epoch of 18.6 years. The Foundation's oceanologist did that and determined that mean daily high water was 0.60 to 0.75 foot above the NGVD over the disputed area. There is a *regular* flow of water in the disputed area, but not like an open beach. Water flow is *regular* in both places over different periods of time. NOAA and the dissent might not consider this flow "tidal", but their understandings do not fix the Foundation's boundary. The civil law does. The issue in the case, stripped of obscuring rhetoric, is whether the regular movement of water over the disputed area makes it a "shore" within the meaning of the original land grants and the governing civil law at the time as construed in *Luttes*. That depends on whether the conditions *Luttes* considered were materially different from those in this case, and the answer to that is no, as the extensive passages we have quoted from *Luttes* demonstrate.

The dissent argues that using mean daily high water levels to mark the shoreline in an area like this "is simply junk science."[76] But the determination of where to mark a shoreline is a matter of law, not science. The law might place the shoreline at the highest level reached by water annually, as for example the court in *Humble Oil* concluded the civil law did. Or the law might locate shorelines at changes in vegetation and elevation, as the State argues should be done here. In fact, however, according to *Luttes*, eighteenth

---

**74.** Id. at 53.

**75.** Post at ——.

**76.** Post at 292.

century civil law did neither but instead marked shorelines where mean daily high water levels intersected the upland. The civil law rule was based on the policy of the cultures it served, not "junk science". To reject that rule two hundred years later because this Court now thinks it was unsound would be junk law. The dissent argues that *Luttes* was ill-advised to adopt a single rule for all circumstances, but *Luttes* did not adopt a rule; *Luttes* interpreted the rule that Spain and Mexico had adopted. Whether that rule was well—or ill-considered is irrelevant. The grants in this case and in *Luttes* are governed by the civil law rule, whatever it was, and *Luttes* expressly determined what it was.

The dissent suggests that the boundary line determined by using a mean high water level one foot above the NGVD is different from the boundary that would be determined using actual water level measurements, but this is simply not true. Whether mean high water is as low as seven inches or as high as twelve inches above the NGVD, the boundary line is exactly the same: the west bank of the Intracoastal Waterway. The evidence does not, and need not, show where the boundary was before the Intracoastal Waterway was dredged.

The dissent argues that historical evidence better shows the location of the boundary line, even though it concedes that surveys were not intended to establish boundaries. Historical evidence is important in trying to understand what the civil law meant by a shoreline, but once that law has been interpreted, it cannot be defeated by the views of individual surveyors and others. *Luttes* held that what Spain and Mexico meant when they granted land to a shoreline was mean daily high water level. That said, the historical record in a particular case no longer matters.

No surveyor or grantee could either expand or contract the meaning of the sovereign's grant.

Finally, the dissent studiously ignores one very important fact: that water reaches the bluff line the State claims as a boundary at most once or twice a year. It is odd to think of a shore as the place where water almost never is.

\* \* \* \* \*

For the reasons we have explained, we reverse the judgment of the court of appeals and remand the case to the trial court for rendition of judgment in accordance with this opinion.

Justice ENOCH filed a dissenting opinion, in which Justice BAKER and Justice HANKINSON joined.

Justice ENOCH filed a dissenting opinion, in which Justice BAKER and Justice HANKINSON joined.

*Luttes v. State*[1] decided as a matter of law that Texas shorelines are measured by the mean higher high tide. As well, the question *Luttes* answered is decidedly different from the question in this case— whether as a matter of fact the mean higher high tide can be measured. The Court today not only misreads *Luttes*, but conflates *Luttes'* question of law with this case's question of fact. I respectfully dissent.

Clearly aware that, in this case, the tide cannot be measured, the Court, ostensibly relying on *Luttes*, equates measuring high tide with measuring daily water levels in the Laguna. But by doing so, the Court strips *Luttes* of any legitimate foundation. *Luttes* did not decide that measuring daily water levels in the Laguna is the same thing as measuring daily tide levels, but

1. 159 Tex. 500, 324 S.W.2d 167 (Tex.1958).

rather it assumed that those water levels reflected tide. All parties agree that *Luttes* requires computing water levels over an 18.6–year period. What the Court ignores is that 18.6 years is the length of an entire tidal cycle.[2] Thus, *Luttes* necessarily requires the water levels being measured to be tidal levels. And here, tide cannot be measured.

The Court tries to bridge this fault line by noting that the Court in *Luttes* used the word "water" when it concluded that the mean higher high tide line in the Laguna could be determined. And because the Laguna's conditions here and in *Luttes* are essentially the same, the Court accordingly concludes that mean higher high tide can be determined in this case as a matter of law. But the Court's bridge crumbles in the absence of a fact the Court assumed in *Luttes*—that the tide could be measured. All parties in *Luttes* assumed that some tidal movement could be measured. Of course, that assumption is no longer viable because we now have the undisputed fact that, as concluded by the federal government, the tide, at least in this part of the Laguna Madre, cannot be measured.

To avoid the impossibility of finding the mean higher high tide, the Court slides into asserting that what *Luttes* really meant is that any water level could be measured against the 18.6–year tidal cycle to determine the water levels' mean. But that is simply junk science. If one is not measuring the tide, then extrapolating whatever water measurement you have over the 18.6–year tidal cycle simply produces a number. It doesn't produce the mean for higher high tide. Regardless, the Court obviously sees the problem because rather than render judgment on any tide line, it directs that judgment be ren-

dered for the Foundation on a line surveyed by Matt Claunch and Bill Lothrop because that line is somewhere above the mean higher high tide line. Hardly a jurisprudentially sound decision. One would be hard pressed to find any case in Texas jurisprudence in which the court awarded judgment to a party on what the party was willing to take absent the party proving it was entitled to take at least something. Furthermore, the Claunch/Lothrop line does not purport to locate the mean daily higher high water level, let alone the mean tide line. Rather, it locates a line one foot above the National Geodetic Vertical Datum of 1929 (Datum Plane), which is a fixed reference adopted as a standard geodetic datum for elevations determined by leveling.[3]

All the parties to this litigation and even the Court knows that no one can determine the mean tide line and use it to locate the Laguna Madre's west margin. And while the Court ignores this scientific conundrum, in the end, it obviously concludes high water measurements cannot be used. For with no legal or evidentiary support, the Court instructs the trial court to enter judgment for the Foundation using the Datum Plane plus one foot line.

But the Court need not ignore the record and apply a tidal formula to non-tidal data to determine the proper boundary in this case. We have two hundred years of history about the west margin of the Laguna Madre to guide us. And establishing the boundary using historical evidence is fully supported by pre-*Luttes* case law. Moreover, the State produced evidence supporting the jury finding that the State's proposed boundary, which was based on physical evidence and historical documents, marks the west margin with rea-

---

2. *Id.* at 192 (opinion on rehearing).

3. *See* CTR. FOR OPERATIONAL PRODS. & SERVS., U.S. DEP'T OF COMMERCE, TIDE AND CURRENT GLOSSARY 17 (1999).

sonable accuracy. Accordingly, I would affirm the court of appeals' judgment in favor of the State.

## I. THE PROBLEM WITH *LUTTES*

The problem with insisting *Luttes*, irrespective of the facts, controls this case is that the Court forces a round peg into a square hole. *Luttes* applies the civil law. And the civil law locates seashores using mean higher high tide. The Court assumes, when it concludes that Luttes permits merely high water to be measured and not high tide, that a mean can be calculated. But the formula we have for calculating this mean requires using the 18.6–year tidal cycle. Thus, it is the tide that must be measured and not simply water levels.

As *Luttes* established, when grantors of civil-law littoral tracts used the word "shore," they intended that it be the area regularly covered and uncovered by the sea over a long period of time, that the upper level of the shore be the shoreline, and that the shoreline be located at the line of mean higher high tide.[4] In selecting mean higher high tide as the shoreline measurement, the *Luttes* Court explained that " 'tide' means the regular and predictable perpendicular daily rise (or rises) and fall (or falls) of the waters as a result of astronomical forces, to wit, the gravitational pull of the sun and moon (mostly the latter) upon the earth." [5] That the Court in *Luttes* intended the tide be measured is clear from the Court's specification that daily tide gauge measurements must be

correlated to an 18.6–year tidal epoch, in which all the astronomic forces in the tidal cycle appear.[6] This intent is also clear from the Court's definition of "tide," quoted above, which focuses on the predictable rise and fall of the waters based on astronomic factors. And it is clear from the Court's reliance on the United States Supreme Court's reasoning in *Borax Consolidated v. Los Angeles*.[7] In *Borax*, the Supreme Court expressly approved the methodology of the U.S. Coast and Geodetic Survey (a precursor to today's National Oceanic and Atmospheric Administration, or NOAA) for calculating mean high tide.[8]

Although acknowledging that water levels in the Laguna Madre are also strongly affected by non-astronomical forces such as wind and weather, the Court in *Luttes* clearly assumed that the tide could still be measured.[9] In fact, the Court went so far as to assume that advancements in science would make measuring the tide even easier.[10] But science didn't get to the answer the Court expected. Since *Luttes* was decided, NOAA has concluded that the tide cannot be measured in areas of the Laguna Madre, including along its disputed west margin. And the Foundation offered no evidence otherwise. Rather, the only evidence is a report from NOAA, published in 1995, which analyzes the Laguna Madre's tide characteristics and concludes that the mean tide cannot be accurately calculated along the disputed property.[11] According to NOAA, other forces acting on

4. *See Luttes*, 159 Tex. 500, 324 S.W.2d at 191–92.

5. *Id.* at 173.

6. *Id.* at 174, 187.

7. 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935).

8. *Id.* at 26, 56 S.Ct. 23.

9. *Luttes*, 159 Tex. 500, 324 S.W.2d at 192.

10. *Id.*

11. *See* Stephen K. Gill, James R. Hubbard & Gary Dingle, U.S. Dep't of Commerce, Tidal Characteristics and Datums of Laguna Madre, Texas 30, 49 (1995).

the water in the Laguna, primarily meteorological, mask the astronomic tide. This, according to NOAA, makes it impossible to determine whether water level measurements are truly tidal. That's because, as NOAA explains, it cannot tabulate tide levels consistently because water levels derived from meteorological forces are not predictably repeated.

The significance of this conclusion is that, in order to correlate daily water measurements to the 18.6–year tidal cycle to produce the mean water level, those measurements must be compared to a long-term control station, where a tide gauge has been in continuous operation for a full 18.6–year tidal cycle. NOAA cautions that this comparison cannot be done properly if the measurements taken from the short-term gauge are not tidal ones because those measurements will not be similar to the measurements from the long-term gauge. NOAA has therefore classified parts of the Laguna, particularly in the disputed area, as nontidal.[12]

The Court dismisses this undisputed evidence by concluding that determining the mean daily high water level is not dependent on NOAA or its policies, which postdate the land grants by more than a century. But the Court's argument obfuscates the issue. NOAA simply and irrefutably states the fact that the tide along the disputed boundary cannot be measured. And tide is precisely what *Luttes* states the civil law requires to be measured for determining shorelines.

The Court apparently buys the Foundation's argument that NOAA's conclusion that the Laguna Madre in the disputed area is nontidal is irrelevant because under *Luttes* it is simply the daily highest water level that is to be averaged, regardless of the cause, and not the daily highest tide.

Pointing out that *Luttes* recognized that the water in the Laguna is strongly influenced by nontidal forces, the Foundation concludes that any tide gauge measurements will do. But this argument robs *Luttes* of its scientific underpinnings. Because *Luttes* required the water measurements to ultimately reflect the 18.6–year astronomic tidal cycle, the underlying measurements themselves must necessarily reflect astronomic tidal highs. Otherwise, the 18.6–year time frame is meaningless. Put another way, if it is not the tide that one is measuring, then factoring that measurement over the 18.6–year tidal cycle cannot produce the mean of the higher high tide.

Cavalierly, the Court concludes that the jury's failure to find that the mean higher high tide line could be determined is "superfluous," because the property's boundary can be located as a matter of law at the Claunch/Lothrop line, which in fact was the only line the Foundation sponsored at trial. But the Claunch/Lothrop line is simply a line one foot above the Datum Plane. A line one foot above the Datum Plane indisputably does not accurately represent the mean higher high tide line. Despite the Court's insistence that *Luttes* controls the outcome of this case, it too must have concluded that the disputed property's boundary could not be determined using the civil law's mean higher high tide line or even the mean of some other water line, for the Court does not actually use either line to locate the boundary.

The Court attempts to divert attention from its gap-filled reasoning by pointing out that the Foundation's tide expert, Dr. Flick, evaluated high water measurements at various locations throughout the Laguna. But Dr. Flick's evaluations were not

12. *Id.* at 53.

the basis of the Claunch/Lothrop line, which had already been surveyed. And the Claunch/Lothrop line was not based on the mean of the higher high tide. It is telling that the Foundation did not rely on Dr. Flick or anyone else to prove the actual location of the mean tide line, relying only on the Claunch/Lothrop line.

Undaunted by this failure in proof, the Court concludes that the Claunch/Lothrop line must mark the Laguna's west margin along the disputed property because the State has conceded that that line is at or above mean daily high water levels. Even if the State made that concession, that fact does not establish the missing proof—that the Foundation's suggested boundary line is the mean higher high tide line. Everyone, including the Foundation, knows it is not.

To be sure, the Foundation maintains that, despite geophysical reality and assuming *Luttes* doesn't require tide to be the boundary's measure, the line of mean higher high water can be calculated here, and the Claunch/Lothrop line is at or above that line. The Foundation notes that Dr. Flick testified that he calculated mean higher high water for the disputed area. But Flick admitted that he did not use NOAA's methodology in performing his calculation, and that in fact he used a methodology he himself had never used before. Essentially, Dr. Flick used non-tidal measurements, factored them over the 18.6–year tidal cycle, and declared he had found the mean. He may have found a number, but it clearly was not the mean of any water level contemplated by the Court in *Luttes*.

According to the civil law and *Luttes*, the boundaries of Texas seashore properties are at the mean of the higher high tide. *Luttes* does not permit using a line at the Datum Plane plus one foot, because that is not what the civil law requires. And *Luttes* certainly doesn't require establishing a boundary at a line that can't be found. True, as the Court says, the jury found that the Claunch/Lothrop line is at or above the mean higher high tide line of the Laguna Madre (although I don't know how, as there is no evidence of this line). But how does that help the Foundation? All the Foundation proved is that its boundary line was not measured by the mean of the higher high tide required by the civil law and *Luttes*. There is no basis in law or in fact for the Court's decision to locate the property's boundary at the Claunch/Lothrop line.

The Court erroneously suggests that I would accept the Foundation's "position" but for NOAA's conclusion that tide in the disputed area of the Laguna Madre cannot be measured.[13] That suggestion results from the Court being confused by its own reasoning. The Foundation's "position" is that *any* high water level can be measured to produce a high water level mean, which according to the Foundation, is all that *Luttes* requires. That's the position the Court buys. I don't. The civil law requires the shoreline to be measured by the mean higher high tide, not just any water level. *Luttes* doesn't hold otherwise.

Further, as I've said, answering the question of law, whether Texas shorelines are measured by the mean higher high tide, does not answer the question of fact, whether the mean higher high tide in this case can be measured. It is not just the Foundation's "position" that fails, but its proof as well. That failure, the Court ignores. I don't. The Claunch/Lothrop line, which is the only boundary line the Foundation proffered and which the Court today imposes, reflects no mean of any water level at all. So much for *Luttes*

13. 90 S.W.3d at 284.

controlling this case. Furthermore, there is a reason the Foundation offered no evidence of the mean higher high tide line. It can't be found. Quite simply, as NOAA's report concludes, no one can measure the tide in this area of the Laguna.

I suspect the reason the Court refuses to confront the scientific problem presented in this case is because the Court concludes that *Luttes* **has** to apply. *Luttes* dealt with property along the west margin of the lower Laguna Madre, and the Court has fixated on the notion that because some of the characteristics of the surrounding property in this case are similar to the characteristics of the surrounding property involved in *Luttes*, the result in this case must be identical. The Court is just wrong.

The difference between *Luttes* and this case is that we now know based on NOAA's work that the water movement in this area of the Laguna is non-tidal. Thus, we also know that the known formula for determining the mean of higher high tide, which requires factoring the measurements over the 18.6–year tidal cycle, cannot be applied. As a result, we cannot determine this water level's mean.

Therefore, despite the Court's insistence to the contrary, *Luttes* and the civil-law rule it identifies simply cannot control the result in this case. In the end, the Court agrees with me, for it locates the property's boundary at the Datum Plane plus one foot line, not the mean water level it claims can be calculated.

## II. LOCATING THE WEST MARGIN OF THE LAGUNA MADRE

If there is no mean higher high tide line to determine the boundary of a civil-law

grant, then how do we resolve this boundary dispute? We return to first principles. The appropriate method for locating a boundary is a legal question for the court.[14] And in locating a boundary, the overriding goal is to follow the grantor's intent.[15] Further, civil-law cases decided before *Luttes* considered historical evidence substantially contemporaneous with the grants in determining a specific boundary line on the ground. Indeed, in *Cavazos v. Trevino*, the Court recognized the importance of such evidence:

> The practical interpretation which parties interested have by their conduct given to a written instrument, in cases of an ancient grant of a large body of land, asked for and granted by general description, is always admitted as among the very best tests of the intention of the instrument.
>
> In construing such a grant, the circumstances attendant, at the time it was made, are competent evidence for the purpose of placing the court in the same situation, and giving it the same advantages for construing the papers, which were possessed by the actors themselves.[16]

Accordingly, historical evidence is appropriate to determine the west margin of the Laguna Madre in this civil-law grant because the civil-law rule for determining seashores cannot be used.

Here, the State's expert, Darrell Shine, correctly examined the historical evidence to determine the location of the west margin of the Laguna Madre that the original grantors intended. Further, the jury

14. *See Brainard v. State*, 12 S.W.3d 6, 14 (Tex.1999).

15. *Wheeler v. Stanolind Oil & Gas Co.*, 151 Tex. 418, 252 S.W.2d 149, 152 (1952).

16. 35 Tex. 133, 163 (1872) (citing *Cavazos v. Trevino*, 73 U.S. (6 Wall.) 773, 784–85, 18 L.Ed. 813 (1867)).

found that the Shine line marks the margin with reasonable accuracy. And there is evidence supporting that finding.

Not only was it undisputed, but experts for both sides testified that based on the original surveys and maps and photographs of the area from the time of the grants to the present, the area's physical characteristics have not materially changed since the time of the grants—two hundred years. As well, the historical evidence shows that the grantors intended the bluff or vegetation line to mark the west margin of the Laguna Madre, making it the eastern boundary of the two grants at issue—the Big Baretta and the Little Baretta. And the Shine line is based largely on this historical evidence.

Shine reviewed the original grants, prior surveys, an early patent for portions of the disputed property, historical photographs, prior court cases, and information from NOAA. He overlaid prior surveys on aerial photographs of the disputed area and observed that the shoreline had not changed noticeably since the date of the earliest surveys, despite the construction of the Intracoastal Waterway in the 1940s.

Furthermore, in 1882, J.J. Cocke surveyed 186 sections of the Big Barreta to enable the State to locate railroad company certificates in the area. The survey did not include the disputed area as a part of the proposed railroad sections, but instead treated it as a part of the bed of the Laguna Madre. In 1902, the State sued some of the Foundation's predecessors-in-interest, claiming the area as unpatented State land. Although the original grant had been lost, the court held that the defendants proved that the grant was issued, and its judgment identified the eastern boundary of the grant as the Laguna Madre's west margin. The court ordered a survey of the area to establish the boundary for issuance of a patent. That judgment was affirmed in *State v. Spohn.*[17] After the *Spohn* judgment, F.M. Maddox surveyed the Big Barreta grant, and a patent was issued on the Maddox field notes in 1907. Maddox's survey generally conformed to the Cocke survey. Both surveys confirm that the Big Barreta grant did not include the disputed property.

Also in evidence were the original grants and surveys of the Little Barreta. The Little Barreta was originally surveyed by Domingo de la Fuente in 1834. In 1879, Cocke made a confirmation survey of the Little Barreta grant. The meander lines of the Cocke survey conform closely to de la Fuente's diagrammatic sketch.

Physical evidence on the ground also supports the Shine line. George Cole, an expert in surveying water boundaries, testified for the State. He explained that, to find a water boundary when tidal data are not available, a surveyor would find the location of the ordinary high water mark. The ordinary high water mark is a physical feature impressed on the ground by standing water, due to changes in vegetation or in the soil itself. Cole testified that Shine's line basically follows what Cole would consider to be the ordinary high water mark in the disputed area.

In rejecting the Shine line, the Court avoids the weight of history by dismissively asserting that Shine simply followed previous surveyors' meander lines, and noting that meander lines in and of themselves are not the boundary. True also, as the Court maintains, the original surveys of civil-law land grants were not done to establish a boundary but to ensure adequate grazing land. And, the Court claims that *Luttes* rejected use of a bluff or vegetation line as a boundary.

17. 83 S.W. 1135, 1135 (Tex.Civ.App.–1904, writ ref'd).

But none of these arguments justifies the Court ignoring history, nor do they provide authority to reject the jury's finding that the Shine line reasonably accurately locates the west margin of the Laguna Madre. The Court's arguments make sense only if one blindly accepts that *Luttes* controls irrespective of whether the civil law's mean higher high tide can be measured.

In the typical case, meander lines are not themselves a boundary line.[18] But the meander lines of earlier surveys are historical evidence of where the surveyors understood the Laguna Madre's west margin to be. And Shine's line is consistent with the evidence of where *every* surveyor before Claunch and Lothrop placed the west margin.

Moreover, an authority no less than the United States Supreme Court has permitted meander lines to establish a water boundary in a case in which the physical characteristics of the area in question made it impossible to use other methods. In a series of decisions involving a dispute between the United States and Utah about the boundary of the Great Salt Lake, the Court was called upon to determine the original boundary of the Lake when Utah was admitted to the Union in 1896.[19] A meander line had been surveyed around the Lake in segments beginning in 1855 and finally concluding in 1966.[20] The customary method for locating the Lake's boundary would have been to locate the ordinary high water mark, which is typically indicated by a line of vegetation or erosion.[21] Because of the unique physical characteristics of the Lake, no such line could be found, in the past or the present.[22] Moreover, a variety of factors combined to produce fluctuations in the Lake's water level, causing water to flood and recede from large surrounding areas of flats.[23]

The Special Master appointed by the Supreme Court concluded that "the meander line is believed to be the most reasonable answer" to the boundary question.[24] The Special Master also concluded that historical data was significant in fixing the boundary.[25] The Supreme Court adopted the Special Master's report and issued his recommended decree.[26]

Regarding civil-law grants, this Court has never absolutely rejected original civil-law grant surveys as some evidence of the grantor's intent. Interestingly, as the Court discusses, courts have observed that it was not unusual for original surveys to contain excess land and to be done for the purpose of assessing payment due from the grantee.[27] But ignored by the Court in this case, is that the evidence indicates the opposite, that here the disputed area was intended to not be part of the grants. Moreover, subsequent surveys and maps

18. *See, e.g., Stover v. Gilbert,* 112 Tex. 429, 247 S.W. 841, 842 (1923).

19. *See Utah v. United States,* 427 U.S. 461, 96 S.Ct. 3187, 49 L.Ed.2d 625 (1976).

20. Report of Special Master in *Utah v. United States, reprinted in* 1976 Utah L.Rev. 245, 265, *adopted in* 427 U.S. 461, 96 S.Ct. 3187, 49 L.Ed.2d 625 (1976).

21. 1976 Utah L.Rev. at 255.

22. *Id.* at 255–56.

23. *Id.* at 253.

24. *Id.* at 295.

25. *Id.* at 301–02.

26. *Utah,* 427 U.S. at 461, 96 S.Ct. 3187.

27. *See, e.g., Stover,* 247 S.W. at 842; *Corrigan v. State,* 42 Tex.Civ.App. 171, 94 S.W. 95, 98, *writ ref'd,* 94 S.W. 101 (Tex.1906).

located the west margin of the Laguna Madre in substantially the same place.

Overstating *Luttes,* the Court suggests *Luttes* declared that a bluff line can never provide evidence of a boundary. But that is not true. *Luttes* concluded only that the bluff line in that case could not be the mean higher high tide line, where it was clear that the bluff line had been the original shoreline and the evidence showed that the water had since receded.[28] In fact, consistent with the notion that a vegetation or bluff line could be relevant, the Court in *Luttes* anticipated that the shoreline would have obvious physical characteristics on the ground.[29]

Finally, the Court suggests that accepting the Shine line as the boundary in this case will create confusion along the entire Texas coastline. I disagree. I recognize that the *Luttes'* declaration about the civil law was designed to provide the benefits of certainty and stability for civil-law shoreline boundaries. But the civil law, as a matter of law, requires the mean higher high tide line to be used. In this case, that line cannot be found as a matter of fact. Furthermore, I find the Court's argument about predictability of shorelines ironic. Not until this Court's decision today does the Foundation even have an argument that its property's boundary is at some location different than where the historical evidence shows it to be. And today, without so much as a blush, the Court chooses the Foundation's boundary, the proof of which shows that it was found by determining neither the mean of the higher high tide nor any other water.

### III. CLAIM AND ISSUE PRECLUSION/ATTORNEYS' FEES

Because I would dispose of the case in the State's favor on other grounds, I would not reach the State's argument that the Foundation's claims are barred by either claim or issue preclusion. Further, I agree with the court of appeals' holding denying the State's and the Foundation's claims for attorneys' fees.

### IV. CONCLUSION

The civil law identified by *Luttes* requires that Texas property shorelines be located at the mean higher high tide line. *Luttes* cannot control the result in this boundary dispute because the Laguna Madre's west margin cannot be located using the mean of the higher high tide. That's because the only available water measurements are non-tidal. Moreover, the Foundation not only failed to carry its burden to prove to the jury, but it produced no evidence that the Claunch/Lothrop line marks the Laguna Madre's west margin even under its own theory about *Luttes.*

Because the mean of the higher high tide cannot be determined, and because the west margin has not changed since the original grants, I would hold that the west margin may be located by historical evidence substantially contemporaneous with the grants. Further, the State produced evidence that its line—the Shine line—is consistent with the historical evidence substantially contemporaneous with the grants and with physical evidence of the high water mark in the disputed area. Consequently, I would hold there is some evidence supporting the jury's finding that the Shine line "marks with reasonable accuracy the line between the fast land and the shore of the Laguna Madre." Thus, I would affirm the judgment of the court of appeals. Because the Court does not, I must dissent.

---

28. *Luttes,* 159 Tex. 500, 324 S.W.2d at 192 (opinion on rehearing).

29. *Id.* at 180.

# APPENDIX 1

## SOUTH TEXAS GULF COAST REGION